Filed 1/28/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PATRICIA W., et al.,<br><br>        Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF DEL NORTE COUNTY,<br><br>        Respondent;<br><br>DEL NORTE COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,<br><br>        Real Parties in Interest. | A146378<br><br>(Del Norte County<br>Super. Ct. No. JVSQ15-6015) |

**INTRODUCTION**

Patricia W. (mother) and J. T. (father) are the parents of two and a half year-old S.L.  They petition for extraordinary relief to overturn an order entered at a six-month review hearing terminating reunification services for them, and setting a hearing for January 22, 2016, under Welfare and Institutions Code section[1] 366.26 to establish a permanent plan for their son's adoption.

This is a sad tale of a family broken up by mental illness.  A local social services agency, acting with commendable speed, removed a toddler from his parents' custody when his mother ran out of her medication and, a week later, experienced a relapse of schizophrenic episodes that involved violent hallucinations of harming and killing their

---

[1] Except where otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

child. The sole reason it removed the child from the father's custody was a concern he was in denial about the gravity of the mother's mental illness and therefore could not, and would not, protect the child from his mother.

The law requires a court to decide, at six months, whether a parent has been provided or offered "reasonable services . . . designed to aid the parent or legal guardian in overcoming the problems that led to the initial removal and the continued custody of the child . . . ." (§366.21, subd. (e).) Here, the problem that led to the child's detention was the mother's failure to properly take her medication. But there is no evidence the agency in this case even sought to diagnose the mother's mental illness and her medication needs as part of a case plan, much less help S.L.'s parents ascertain whether and how they could more effectively manage and monitor her medication to avoid another relapse.

The agency got court approval for two psychiatric examinations of the mother, but not in order to facilitate reunification services for either parent. Rather, it did so in order to potentially bypass mother's reunification services altogether, due to her mental illness. And even so, the only evidence of the results consists of several sentences in the social worker's report that shed practically no light on the examining psychologists' conclusions or mother's condition. The mother also had a treating psychiatrist who prescribed and monitored her medication, but that individual was not called as a witness. Her social worker also had doubts during the reunification period that the mother was staying on her medication but, by all accounts, did not fully investigate whether that was true. She admitted on cross-examination she didn't even know if mother was on the right medication, and that if mother wasn't then her recommendation to terminate services might change. And whatever mother's medication needs might have been, a subject concerning which there is no substantial evidence from any competent medical professional, there also is no evidence the agency offered services to either parent designed to help them improve mother's ability to take her medication as prescribed.

2

In these circumstances, we conclude no substantial evidence supports the trial court's findings that adequate reunification services were provided to either parent. Accordingly, we grant both petitions.

## BACKGROUND

S.L. was born in July 2013. His parents are unmarried but live together. When S.L. was born, mother began hearing voices for the first time in her life, which initially was thought to be post-partum depression but later was diagnosed as schizophrenia. The voices were scary to her, and sometimes, though not always, would urge her to injure or kill people, including her son. She testified she didn't like hearing these voices and resisted them, and would seek immediate psychiatric treatment whenever she heard them—either by contacting her counselor or psychiatrist on an emergency basis, or by going to a hospital psychiatric ward where she could be safely away from her son and detained until the hallucinations had passed.

When S.L. was two months old, the Del Norte County Department of Health and Human Services, Child Protective Services ("Agency") initiated dependency proceedings and removed S.L. from his parents' custody, due to concerns arising from mother's mental illness. The record contains few details of that proceeding. Based largely on reports filed by the Agency and S.L.'s court-appointed advocate, it appears the initial proceeding was opened in September 2013 because mother was having delusions and hearing voices telling her to kill her child. Mother and father received counseling and other parenting services. After nine months, S.L. was returned to his parents' custody and judicial supervision terminated. Under the safety plan put into place, father was not to leave their infant son alone with mother, although he had done so three times while the case was open, and he was to monitor mother's medication to ensure she took it as prescribed.

3

# I.

## *The Petition*

On February 4, 2015, shortly after the first case closed, the Agency initiated this dependency proceeding and S.L. was detained a second time. He was 18 months old.[2]

According to the Agency, mother was expected to be released from a mental health facility the following day and father was refusing to speak with the Agency. Yet "[m]ental [h]ealth professionals have voiced concern if [S.L.] is left alone with mother, for even a few moments, she is capable of seriously harming or killing her child." The petition alleged father "has stated that mother does not have a significant mental health problem, that 'she's never done anything violent and is very passive' and he is not worried about her hurting their child." The same social worker who had been involved in the prior dependency proceeding, Deidra Ward, was assigned to this case.

The following day, after S.L. had been removed, the Agency filed an amended petition asserting jurisdiction both under section 300, subdivision (a), alleging mother posed a risk of serious physical harm to S.L., and under section 300, subdivision (b) alleging father was failing to protect S.L. from mother and mother was unable to care for him due to mental illness.

***Allegations Against Mother.*** The amended petition alleged that mother (1) "suffers from bipolar with persistent delusions along with command auditory hallucinations. The voices [mother] hears have told her to kill her son . . . , her boyfriend [father], family members, and herself"; (2) "has identified several plans as to how she will kill her son, [S.L.], age 1. She has identified use of rat poison, use of a knife, drowning in a bathtub and has stated that if she had access to firearms, she would already have killed [S.L.]"; (3) "has been non compliant with her medications which exacerbates her condition" and "has doubled up on her medication so she is off her medications prior to refill and does not request a refill of the prescribed antipsychotic medication"; (4) "has

---

[2] It is unclear precisely how much time elapsed between the two proceedings. It appears to have been anywhere from one month to several.

been hospitalized in psychiatric hospitals on at least two separate occasions since January 15, 2015 for periods of longer than one week"; and (5) "[o]n or about February 3, 2015, [mother] continued to hear auditory hallucinations commanding her to commit infanticide despite medication compliance in a psychiatric hospital setting. [Mother's] continued hallucinations place [S.L.] at significant risk of harm or death."

*Allegations Against Father.*  The Agency alleged, in effect, that father was in denial about the dangers mother posed to S.L.  It alleged he (1) "minimizes [mother's] conditions and has related that he does not believe that [mother's] mental illness impacts her ability to parent or care for [S.L.]"; (2) has stated "[mother] does not have a significant mental health problem[,] that[] "she's never done anything violent and is very passive'" and that "he is not worried that [mother] will harm [S.L.]"; and (3) "is unable to protect his son [S.L.] as he does not believe that the mother will harm the child.  This places [S.L.] at significant risk of harm or death."

## II.

### *Detention and Jurisdiction Hearings*

At the detention hearing the next day, the court ordered detention of S.L. who had been placed in a licensed foster home.  By this point, mother was homeless and living in a shelter, but by the end of the day she had reconciled with father and was back in the home.

According to the court's minutes of the detention hearing, "the Court expects maximum visitation for the father," but for reasons that are not apparent from the record, the court ordered only the minimum amount under its standing order for each parent, as requested by the Agency, which was five hours of weekly supervised visitation.  The minutes also state "[t]he Court suggests a psychological evaluation of the father."  The court ordered the Agency to provide "[m]ental health service and treatment" and "[p]arenting" services to reunify S.L. with his family.

The Agency's detention report described three reports it had received during a two-and-a-half-week period beginning January 15, 2015, which prompted it to initiate

5

this proceeding, all of which shared the "reoccuring [*sic*] theme that [mother] wants to kill her child."

In the first incident, mother reportedly tried jumping out of a moving vehicle while father and S.L. were with her. Law enforcement officials took her to a hospital for evaluation, where she was placed on a 72-hour hold due to suicidal and homicidal thoughts. She reported hearing voices telling her to kill herself, her child and her family. According to the medical evaluation, mother "was not compliant with her medications, she was doubling up on her antipsychotic medications and would subsequently run out of medication." Father opposed the hold, reported there were no mental health concerns with mother, and stated everything would be fine and he wanted to take her home. Several days later, Ward and another social worker spoke with father who told them mother had been off her medication for eight days and had been waiting to be seen by her mental health provider for a refill, because unbeknownst to him she had been doubling up on her medication. He watched mother take her medications every night but said he thought she was doubling up and taking them in the morning, too, which had caused her to run out. The two social workers reported smelling marijuana and believed father had been smoking it in S.L.'s presence in the living room, which he denied.

The second incident took place roughly a week later, after mother had been released from the psychiatric hospital but then voluntarily checked herself back in a day later. Mother was again reported as having heard voices and having detailed, homicidal thoughts. Father was reported as having been frustrated that mother "does not take her medications consistently" but, again, was not worried and did not believe she would ever hurt S.L. And, mother told the hospital's mental health staff that father would leave S.L. alone with her even though he knew about her violent thoughts.

According to the detention report, mother spoke with Ward by phone in this period and reported that "they narrowed down her diagnosis to Mood Disorder but they are not sure which one" and told Ward "they changed her medication to Latuda and she still takes Effexor."

6

The third incident took place roughly ten days later, the day before the Agency initiated this proceeding, after mother had been transferred to another psychiatric hospital. Once again, she was reported as hearing voices telling her to kill her baby and others, including that "[i]t's a good thing I don't have a gun or I would shoot him." According to that mandated reporter, "killing her child is a recurring theme in her illness which is not well controlled despite medication compliance while [mother] was hospitalized."

The Agency concluded that father was unable or unwilling "to take the protective measures necessary to assure [S.L.'s] health and welfare. He does not believe her mental illness is severe and does not believe that [mother] would act on what the voices are telling her. One of the reporting parties stated [mother] should not be alone with her child, not even for a few minutes as this is enough time for [her] to act on what the voices are telling her." Yet father "has consistently and continually minimized the seriousness of [mother's] mental illness and despite knowing that she has thought of killing [S.L.] and that she has not been consistent with her medications, has left [S.L.] alone in her care which places [S.L.] at serious risk of physical harm or death."

According to the detention report, previous services the Agency had provided the family "have not been effective in assisting [mother] or [father] to address and resolve their problems involving [mother's] mental illness and [father's] failure to protect." Those services consisted of "Counseling, Case Management, Parent Training, Public Assistance Services, Transportation, Other Services."

The jurisdiction hearing took place two weeks later, on February 20, 2015, before a different judge. There was evidence in the Agency's jurisdiction report that early on, in February, father had been discouraging mother from taking her medication and seeking mental health treatment and that mother was taking medication without any supervision.

The judge found true the petition's allegations, asserted jurisdiction over S.L. under section 300, subdivisions (a) and (b), and set the matter for a disposition hearing.

7

*March 20, 2015 Disposition Hearing*

A month later, the Agency filed a disposition report that included a proposed case plan, but expressed reservations as to whether mother would be able to engage in or benefit from reunification services. According to the disposition report, mother reported having five medical diagnoses: "OCD, bipolar, anxiety, depression, and schizophrenia." She believed she already had killed two children and three other people, and was capable of killing her son too. The disposition report was critical of father's personality ("reclusive and isolating," "controlling and abusive," "domineering," "condescending," "dismissive," "critical," "blames others") and described tensions in the parents' "on again off again" relationship. It also reflected some reluctance on their part toward keeping their son.[3]

The Agency recommended the following reunification services:

1. Participation in a program called Pre-CAPTP in order to learn appropriate anger management skills for parents;

2. Work with a Safety Organized Practice (SOP) team in order to develop positive support systems with at least two friends or family to whom they could turn for help when feeling overwhelmed or stressed; and

3. Participation in a parenting program called "Incredible Years" in order to learn appropriate parenting skills.

4. The Agency also recommended mother continue to meet with her mental health clinician and her tele-psychiatrist in order both to "help her not harm others, stay safe,

---

[3] According to the Agency, mother said she should never be around children, is not able to parent her son and should not be alone with him, wanted her son to live with her mother in New York where S.L. would be safe, "would like to put her backpack on and hitchhike away from here" and left a phone message telling the Agency that she would not visit S.L. anymore because she'd like him put up for adoption. For his part, father said mother is crazy and he doesn't want her around, wanted her to go live with her own mother and he would keep their son, but also that he didn't want to " 'do this alone, you might as well send [S.L.] to grandma's.' "

and live happy" and to "monitor and manage her psychotropic medications and her symptoms related to her mental disability."[4]

Shortly after proposing this case plan, the Agency took steps to bypass reunification services altogether and terminate mother's parental rights on the ground of her mental illness. Citing both Family Code section 7827[5] and section 361.5, subdivision (b)(2) which provides that reunification services need not be provided to a parent or guardian found to be suffering from a mental disability "that renders him or her incapable of utilizing those services" (§ 361.5, subd. (b)(2)), the Agency filed a request for two court-ordered psychological evaluations of mother. The stated purpose was "to determine if objective mental health professionals (1) believe she is capable of killing, injuring, or neglecting her child and (2) believe she could benefit from the services available in order to safely reunify with her child." The Agency stated it "believes [mother] is not capable of parenting her son without putting him at extreme risk of physical abuse or neglect based on her mental disability." It believed mother "wants her child safe and knows she is not able to do this but she is persuaded by her partner to keep trying because he does not want to parent this child alone and does not want to give up on the child."

At the disposition hearing on March 20, 2015, the court declared S.L. a dependent, ordered the Agency's recommended reunification services, and ordered mother to submit to an evaluation by "2 psychologists/psychiatrists."

Mother testified she was examined by two psychologists thereafter: five days later on March 25 by "Dr. Roy," and three months later, on June 30, by "Dr. Morrell."

---

[4] In addition, father, who had a number of drug convictions for marijuana-related offenses, claimed to be using medical marijuana to treat chronic back pain. The Agency expressed concern he "lacks the alertness and energy necessary to parent an active, happy toddler." So the Agency also recommended as part of the case plan he "consult with his primary care provider to discuss alternatives to help him live with his disability and be able to function by demonstrating he can provide safe care for his child."

[5] That statute governs petitions to terminate parental rights based on mental disability. (Fam. Code, § 7827) It requires the evidence of "any two experts" who meet specified licensing and credentialing requirements. (See *id*. subd. (c).)

## IV.

### *The Agency's Six-month Status Review Report*

Shortly before the six-month review hearing, the Agency filed a status report recommending that reunification services be terminated and a permanent planning hearing set under section 366.26.

According to the Agency, S.L.'s parents "want their son home so they can parent him the way they like," and believe they did nothing wrong. But the Agency reported they "have not fully engaged in the services outlined in their case plan." The Agency remained "very concerned" for the child's safety if he were returned to either parent, "[g]iven the severity of the directions [mother] was hearing from the voices in her head before [S.L.] was detained" and "the minimizing and sometimes flat out denial by [father] that the voices were being heard or that [mother] could potentially act upon them."

*Mother*. The Agency reported mother "states she is better now, she hasn't heard voices in a long time and she should be able to parent her son," and that "her mental health crisis appears to be in abeyance for the time being, however she has stated she does not like the way the medication makes her feel but when not on medication, she has stated she knows she cannot take care of [her son]."

The Agency reported on the results of the court-ordered mental health examinations in three sentences: "Based on the psychological evaluations and a brief conversation with both Dr. Roy and Dr. Morrell, [mother's] mental health symptoms are severe and could have 'horrendous consequences' according to Dr. Roy. A mutual concern is [mother's] defensiveness about her mental illness that results in her denial of her condition and restricts the reliability of the testing. A positive is that she appears to be medication compliant but needs to remain so in order to ameliorate the potential for hearing voices (auditory command hallucinations) that tell her to kill her partner and her

10

son and act upon those instructions." The Agency also noted some negative feedback from the examining doctors concerning the parents' relationship.[6]

The Agency's six-month status report also expressed doubts mother was taking her medication. It noted her "behavior of late has been quite concerning and not her normal behavior, which causes the Department to believe she is not taking her medication as required." It reported mother "states she is taking her medication as required, however this has not been verified." And it described abrupt "mood changes" whereby mother "becomes agitated, aggressive, threatening, and frenetic." It reported, "This change in behavior causes a concern that when anyone tells [mother] something that she does not agree with or does not want to hear, she goes into this intense behavior that is socially unacceptable and alarming and will result in her not getting her needs or her child's needs met."

Mother's participation in her case plan got mixed reviews. The most significant areas in which the Agency reported her as falling short was refusing to participate in several SOP meetings, and failing to complete the Incredible Years parenting class which she had completed in the earlier case. Mother had regularly been meeting with her psychiatrist and her therapist, Carol Kays, during the reunification period though she missed two appointments with her therapist.

*Father*. The Agency reported father was still in "continued denial about the seriousness of [mother's] mental health crisis when [S.L.] was removed," and was "refus[ing] to cooperate and communicate" with the Agency. He was reportedly resistant to taking parenting advice. The Agency also remarked upon father's physical limitations,

---

[6] It reported, "Another shared concern from the psychologists is that [father] does not recognize his faults and shortcomings so is unable to make necessary changes along with not accepting and minimizing the seriousness of [mother's] mental illness. Dr. Morrell describes [mother's] relationship with [father] as 'he could be a fly in the ointment' based on corroborative information that leads him to conclude [father] is controlling and immature. Dr. Roy believes the relationship between [mother] and [father] 'seems tenuous, is perhaps convenience, and is lacking in affection, respect, and committed love.' "

11

commenting he "states he is disabled, often in pain and cannot lift [S.L.] or be physically playful with him, so during visits he often sits when [S.L.] wants to play."

Father reportedly met none of his objectives under the case plan, other than having recently completed the intake process for the pre-CAPTP anger management class. He too had walked out of several SOP meetings and, like mother, did not participate in the Incredible Years parenting program, which he too had completed in the first case.[7]

## V.

### *Report by Court-appointed Special Advocate*

Before the hearing, S.L.'s court-appointed special advocate (CASA) filed a report recommending termination of parental rights.

CASA's report included observations about the parents' participation in their case plan that were largely duplicative of the Agency's.

CASA's feedback concerning the family's supervised visitation was largely positive. During the three-and-a-half month period from May 5 to August 27, mother had attended 49 of 51 visitations, missing only two; father had attended 46, missing five. The visitation aide's summary of that period was almost entirely positive, noting only one occasion on which mother became angry, screamed uncontrollably, and swore at the aide while father tried to quiet her down. The following day, there was an uneventful, more subdued visit during which the visitation aide noticed bruising on mother's jaw and arm and a cloth wrapped around her wrist. And on the following day, September 3, the parents visited S.L. at a park, where the visitation aide noted mother played with S.L. while father remained mostly seated.

The advocate, Christine Slette, observed two supervised visitations and had few criticisms of either parent. On one occasion, she thought father seemed pre-occupied with answering his phone which rang frequently. And during the second visitation,

---

[7] The Agency couldn't verify whether father had consulted with his doctor about alternatives to medical marijuana, but father provided proof later at the hearing that he had done so which satisfied the Agency.

mother "took the lead" interacting with S.L. compared to father, but spoke in a monotone voice.

CASA concluded that it "continues to have concerns for the safety and well-being of [S.L.] . . . due to [mother's] on-going mental health disability and [father's] inability to put [S.L.'s] wellbeing at the forefront of his responsibilities." The report noted that S.L. "has been under the court's jurisdiction 23 months out of 26 months of his life," and recommended terminating parental rights "[d]ue to the length of time [S.L.] has been under the Court's jurisdiction and the lack of progress with the parents' case plan," because CASA "does not see any indication that if given more time, the parents would be successful in completing their case plan and providing a safe and permanent home."

## VI.

### *Six-month Review Hearing*

A contested, six-month review hearing took place on September 28, 2015, before a third judge. By this time, mother and father were living together again.

The documentary record consisted of all of the Agency's reports and CASA's report, and did not include the case file from the earlier dependency proceeding nor the written reports prepared by the two doctors who had examined mother pursuant to court order.[8]

*Mother's Testimony*. Mother testified she has been diagnosed as a schizophrenic, and that she has tried six or seven of the approximately 30 available medications for her condition.

According to mother, she was stable when S.L. was returned to her after the first case, but then had a relapse in January when she ran out of her medication, Effexor. She thought she had been taking the prescribed amount but wasn't sure. She recalled she might have been taking a second medication at the time too, called Geodon, which is why

---

[8] In response to an inquiry by this court, counsel for the Agency informed us that both doctors prepared written reports and that "[c]opies were provided to mother's attorney only." Father's counsel confirmed that the reports were not provided to the trial court and are not part of the trial court record.

13

she might have run out because one of the two medications was supposed to be taken twice a day and the other one only once. She called her psychiatrist and a pharmacy when she ran out, and was waiting for a different medication when hallucinations began about a week later. She described not feeling right one night at dinner, "like something was off" and so she asked father to drive her to the psychiatric ward of a local hospital, where she voluntarily had herself admitted. She remained there for several days, which is when she began hearing the voices again and hospital staff reported her to the Agency. She was briefly released but then checked herself back into another local hospital because she was still hearing voices.

Mother testified she had been on the same medication, Latuda, since March which was working "as far as I know" and "makes me feel great," and she denied the Agency's report that she didn't like how it made her feel. She testified she had said that about different medications she had been on, Lithium and Geodon, when discharged from the hospital. According to mother, she told the hospital those were the wrong medications: she didn't think she needed Lithium because she's not bipolar, and she thought there was a better medication for her than Geodon that wouldn't have the same side effects. She then consulted about medications with her psychiatrist who switched her to Latuda, which she intends to take for the foreseeable future. She also testified she'd be open to trying a different medication if her psychiatrist recommended it.

Mother repeatedly testified about medication as an integral, critical part of her life that she not only needed but wanted. She acknowledged she needs to be on medication for life, and testified it's no secret from family, neighbors and friends but "definitely, you know, something that's part of my life." She testified she doesn't mind taking medication "at all," and in fact "I want to take medications because I want to be better. You know, I want to be healthy. I want to be around my kid. I want to be around other people's kids too." She testified, "I am doing the very best that I can to stay stabilized" and stressed, "There's so many medications available. There's—it's impossible to say that I'm done for because that's not true."

14

Mother also described the safety precautions she takes.  She sets a daily phone alarm to remind her to take her medication, and takes it daily at dinner in father's presence.  She also texts her mother when she takes her medication or her mother calls her.  Her mother's involvement was an additional, new "safety net" step she took after her relapse.

Questioned about the Agency's concern it couldn't verify whether she was taking her medication, mother offered to take a blood test because "I know for sure I've been taking my medication."  Although she wasn't sure if her current medication would show up in a blood test, she testified she'd had blood tests before and that "if I call my psychiatrist and request one, then I could get one as soon as possible for the court so you guys can see that."

Mother also testified at some length about her own recognition of the need to seek immediate help if she hears voices, and the importance of being on the right medication.  We quote portions of her lengthy testimony:

"I definitely think the [current] medication is helping, because I haven't been back to the psychiatric ward.  And if it gets really bad, that's where I end up going.  And I've been out since February, the beginning of February.  And I've been functioning really well.  And I haven't been hearing any voices.  And if I do start to hear voices, I go right back to—I'm the one that asked for help.  No one told me to do this.  I'm the one that was, like, yeah, I need to get help.  So I would immediately call my psychiatrist or call my counselor.  [¶]  I'm allowed to show up at mental health even if I don't have a counseling appointment for, like, an emergency appointment.  So I would take advantage of those opportunities if I needed to.

"Q     So if you were to hear voices, is that something that you would, perhaps, listen to the voices, or would you go for help immediately?

"A     No.  Yeah.  I definitely wouldn't listen to the voices.  I've never wanted to listen to any voices that I've had.  I've gone immediately for help.  As—as soon as I start to hear voices, I've gone immediately for help.  I didn't stick around.  I didn't, like, hang out. I didn't say, oh, like, maybe they'll go away.  [¶]  Because I'm part of online support

groups for women that have the same conditions as me, multiple online support groups. And, you know, most of them have to take medication. So it's all about the medication really what it comes down. And I'm not a doctor. So if I feel out of sorts or—you know, I just go right to the doctor, try to see the psychiatrist or—you know, I've gone to the hospital before."

Mother testified she was frustrated with her social worker in part because she didn't think the social worker understood she didn't want to act on her impulses and would seek help whenever she heard the voices, including the time she checked herself into the psychiatric ward to be safe and away from S.L. She also testified she has other safe places to go: a nearby neighbor's house and, if need be, New York.

Mother denied having a volatile relationship with father, denied the Agency's speculation that father had physically abused her or that she had hurt herself, and testified they get along "really well." According to mother, the injuries mentioned in the Agency's report happened when she fell during a hike, and another time when she accidently walked into a pole while inattentive and texting.

Mother testified she didn't agree with the results of the court-ordered mental examinations by Drs. Roy and Morrell from some months ago and queried whether it would be possible to get one or two additional psychological evaluations for "more input."

She also testified that the five hours of weekly supervised visitation with S.L was heartbreaking to her, that their young son was at a critical age and needed more time with his parents and that for months she had been asking for more visitation but had been turned down.

Mother testified she was even willing to move and let father retain sole custody of their son. According to mother, "the fact that they're trying to terminate services to both parents when [father] is a really good dad, has never had any type of issues that I've had and he raises his kid really good, is just really not right." She testified she was considering buying a new home and had been planning to move together with father, but that she would be willing to leave him permanently if the Agency returned their son to

16

father and, furthermore, that she can afford to live separately because she has started receiving disability income. She also testified she'd been seriously thinking of moving back to New York, her mother had an apartment for her "ready to go," she already had a bus ticket, and could be on a bus to New York the next day.

Mother also testified she was doing her best to complete her case plan. She described in some detail those efforts which we refrain from summarizing. We note, however, that she testified she didn't repeat the Incredible Years parenting class a second time because Ward told them it was unnecessary. And the reason she gave for declining to participate further in SOP meetings (without a lawyer present, at least) was because Ward told them during an SOP meeting that she didn't think they wanted to be full-time parents, which upset and angered both parents, lost her their trust and prompted them to request a new social worker.

With respect to mental health services, mother testified she began seeing a psychiatrist, Dr. Sharman, when she got out of the hospital from her relapse, who prescribes her medication and she meets with him every eight weeks, apparently by phone ("it's a telepsychiatry"). She also sees a mental health clinician, Carol Kays, weekly to "talk about what's going on in my life" which she found helpful, and whenever she and Kays were unable to meet in person they would always talk by phone.

***Father's Testimony.*** Father disagreed with the Agency's depiction of his relationship with mother, and testified they were "very loving." Nevertheless, father testified his son is of the utmost importance to him, he wants his son back and repeatedly testified he would even be willing to leave mother permanently if he could get his son back.

Father denied that he didn't take mother's condition seriously. He felt he was "compassionate and very understanding" of mother's condition, thinks she is a good, loving mother, stressed repeatedly she has never intended to harm S.L. and has never acted on the voices but has always sought help for them. And he testified that this was the source of his frustrations in this case compared to the first one. We quote his testimony: "And, you know, this last time we asked for help, and we get a stick to us,

17

you know, like. In the previous case when we asked for help and she went to the hospital, we were commended. Oh, you're doing the right thing. You're asking for help. Because she needs help. And everything is safe, you know. The case gets closed. [¶] And we ask for help again, and we get totally shuffled around like we're doing something wrong. [¶] And there's never been any harm. There's never been any intent of harm. There's never been anything acted out. There's never been anything except for, 'I hear some voices. I need help.' [¶] So that's why maybe I was so frustrated at the beginning and maybe I rubbed our social worker the wrong way, because I was so upset that this was happening again that I was kind of mad. And I was kind of, like, why are we doing this again? When this is just picking up where it left off right here."

Like mother, he was frustrated with Ward and with the Agency's refusal to permit them more than five hours of weekly visitation. He also didn't agree with the Agency's decision to remove S.L. from his custody, because mother could have gone to stay elsewhere temporarily, and thought the Agency could have "something set into place that stated she could come back when they deemed appropriate, just as we want to do now."

Father testified he'd never put so much energy into anything as trying to get his son returned. And he felt he had been trying to do all he'd been asked to do under his case plan. Here again, we refrain from delving into specifics other than to note that he too testified the Agency had told them it was unnecessary to repeat the Incredible Years parenting class, he corroborated mother's account of the breakdown in their relationship with Ward that occurred during the SOP meeting, and he attributed his tardiness in getting onto a wait list for the pre-CAPTP anger management class to some initial confusion, when he first started trying months ago in March or April, over how to sign up and whether he even had to.

At the conclusion of father's testimony, to avoid calling four neighbors as witnesses, the court accepted an offer of proof that the parents "have a support group, a

18

safety group, safety net, and that these four different people from four different families out there would testify that they're part of that safety net."[9]

***Testimony of Social Worker Deidra Ward***. We refrain from summarizing all of Ward's testimony about the degree to which the parents participated in their case plan, because it is unnecessary to our decision. We note, however, she testified mother has probably participated in "all" of the services in her case plan "to some degree." Ward corroborated that father didn't get into the pre-CAPTP anger management program earlier, on his first referral, because he told the program director not only that he didn't want to but he also didn't think he had to. She testified the parents were required to repeat the Incredible Years parenting class as a "refresher" but did not deny telling them they didn't have to; she merely could not recall discussing the subject with mother. And Ward acknowledged telling the parents in the SOP meeting that "my worry was that they did not want to be full-time parents, that they wanted to have their child placed in a permanent home with someone other than themselves and they could be part-time parents." She testified mother "flipped out" and "hit the wall," began screaming, her body was shaking, she was making threats, they couldn't get a word in to explain, and she left. They tried to talk to father but he wouldn't listen either, talked over them, defended mother and then left abruptly too. Ward testified she had thought it was a valid concern. And she knew the question would upset them, although not to that degree.

With regard to mother's mental health services, Ward testified she was in regular contact with mother's therapist Kays, who reported mother had been attending therapy sessions "[f]airly regularly," and sometimes even comes in without an appointment "just to seek help or talk to somebody." Ward also acknowledged that three of the five weeks of recently missed appointments were not mother's fault. Ward also acknowledged

---

[9] The court accepted the offer after the Agency's counsel equivocated when asked whether the Agency disputed it, remarking, "I don't know. If that network wasn't arrived at through the SOP process, it hasn't probably been vetted. Nobody knows for sure what level of commitment. It's not a plan in place. That's not what the department does. They might be out there. They might be willing to help. I don't know. But it wasn't done through the case plan process."

mother has been regularly meeting with her psychiatrist to "keep up with her meds regularly."

But Ward also didn't know if mother had been taking her medication, or even if she was on the right medication. According to Ward, mother was "very cooperative" at the outset of this case, just like she had been in the first one. But later she became "very volatile," "very impulsive," "very uncooperative" and began acting inconsistently as to whether she wanted her son back or merely returned only to father, which caused Ward and other social workers to wonder if mother either had stopped taking her medication or was on the wrong medication.

We quote her testimony at some length: "And so it's our observation, and I can only speak for myself, that her behavior is different, very different. And not different good; it's different concerning. She's very volatile. She's very impulsive. She's very uncooperative. [¶] The last case I was the social worker also. And she was extremely cooperative. She did everything she could to get her child back. She went out of her way to maintain communication. If there was a problem, she'd address it. That's not the way she's behaving this time. [¶] And so my concern—I'm not a medical professional, and I could be wrong. But *I don't know if she's taking her medication or if it's even the right medication for her*. I did ask—when I called Ms. Kays, she's kind of the gatekeeper, the go-between between us and Dr. Sharman. *And she said she didn't know, but she would try to find out if they've done any lab work. And the answer was that they have not. And so we don't know*. We don't know if she's been taking her meds." (Italics added.)

Ward testified she had only limited discussions with mother about these concerns, because they arose when the parents stopped wanting to communicate with her. She also acknowledged it was possible the change in mother's behavior could be due to the fact mother was on different medication than in the first case, and that her current medication might not be as effective. "It could be," she testified, "Like I said, that's not my expertise."

20

Asked why she recommended terminating reunification services, Ward explained she hadn't seen sufficient behavioral change in either parent which, to her, was more important than whether they could "jump through hoops" of their case plan. Mother's "demeanor, her approachability, her sometimes lack of reasonable reaction is a concern. [¶] Can she safely parent her child without any support? I would say she couldn't. And the support that she should have is with [father]. And that's what I'm not seeing in him." She faulted father for not adequately monitoring mother's medication as he was supposed to do under the safety plan implemented in the first case, "minimiz[ing] the impact of him not doing that," and "minimiz[ing] her needs to have mental health treatment" at the beginning of the case. "And he's still not taking any responsibility for his part in why his child was removed," she testified. Asked whether father's reaction could be due to the fact that mother was able to police herself by seeking medical treatment when needed, Ward answered, "I don't know how that affects the issue. The issue was not that she sought help, which she should be commended for, but that she got to the place where she had to. [¶] The medication that she was supposed to be taking was supposed to be monitored. She couldn't do it. It was supposed to be monitored by [father], and it wasn't."

Ward acknowledged that mother had told her, after getting released from the hospital, she had run out of her medication and was trying to get a refill. But Ward also testified mother would not have overdosed and run out had she been properly monitored.

Ward acknowledged if a doctor told her mother was presently on the wrong medication, her opinion of mother's current behavior and parenting abilities might be different. She also thought there could be medications or programs available to assist mother with her aggressive and irritable behavior.

Ward testified she would still recommend terminating reunification services if the parents lived apart. According to Ward, they had discussed the possibility of the parents living apart (including mother possibly relocating to New York) in order for father to work toward getting their son back. But she alluded to the parents' frequent on-again, off-again pattern of breaking up and then reconciling soon after, apparently as a reason

21

the matter was not pursued further.  Ward also was concerned about father's ability to be a single parent because "I haven't seen him do a lot of active parenting."  She elaborated with examples.[10]  Asked whether father would be a danger to S.L. if mother were not living with him, Ward acknowledged father would not intentionally harm the child but speculated that passive inaction might pose some danger.[11]

Ward testified if the parents were offered six more months of reunification services, she would revisit the case plan and probably make changes, including more "in-depth," individual mental health counseling for mother and services that would enable father to work on "communication and a respect with his partner as the mother of his child, and his life partner."

*Testimony of S.L.'s Court-appointed Special Advocate.*  S.L.'s court-appointed advocate, Christine Slette, testified she continued to support the Agency's recommendation to terminate services.  She testified about the two visitations she had observed, which cumulatively lasted about two hours.  Her testimony on the subject was largely duplicative of her report.  She also testified that S.L. was receiving speech therapy, and developmentally appears to be a normal, two year old.

---

[10] For example:  "He does a lot of sitting."  "He doesn't interact frequently with his child."  "[H]e is extremely authoritative towards [mother]."  During supervised visits to the park, "he does a lot of sitting on the park bench while mom runs [S.L.] around the playground."  "[H]e doesn't stand at the end of the slide and watch [S.L.] slide" even though he does watch the child on the swing and sits and has snacks and meals with S.L. at the park.  During office visitations, father interacted with S.L. from a seated position (putting the child on his lap to talk, or read), was less interactive than mother, and changed his son's diaper only when mother wasn't present.  Ward acknowledged she'd observed, or read in visitation reports, about "good behavior" by him but not frequently.  "Most of the time he's pretty stand-offish.  I mean, he sits back and observes from a distance."

[11] She testified, "That I don't know.  I don't know.  And the only assumption I could make would be that it would be for lack of doing something, not for an intentional harming.  [¶]  Q But that assumption is not consistent with the behavior that you described when the mother is not doing something, he does step up to the plate such as the changing the diapers and having played with the child, albeit not as much as we would like.  It's totally an assumption what you just said; right?  [¶]  A Totally."

22

Asked what her strongest reason was for recommending termination of reunification services, she emphasized speed and past history: "In my view, in my role as a CASA, it would be safe, permanent home for this child as soon as possible. [¶] And this child has been under the jurisdiction of the court for about 24 months out of his 26 or 27 months to date of his life. And for that reason, I think it would be important to move forward and find permanency for this child."

At the conclusion of the hearing, the child's lawyer reversed position and urged the court to extend the parents' reunification period. Following argument, the trial court terminated reunification services and set a permanency planning hearing for January 22, 2016. The court found that returning S.L. to his parents would create a substantial risk of detriment. The court clarified, "[B]asically, emotional detriment in the sense that he will not thrive. He will not develop. He will not be able to overcome his current underperformance, if you will, for lack of a better word." The court found that reasonable services had been offered and provided, the Agency complied with the case plan, and that "[t]he extent of progress made by the parents has been insufficient."

These petitions followed.

## DISCUSSION

Welfare and Institutions Code section 366.21, subdivision (e) permits the trial court, at a six-month review hearing for a dependent child under the age of three, to schedule a permanency hearing pursuant to section 366.26 if the court "finds by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan." (§ 366.21, subd. (e)(3).) But the court lacks that discretion, and "shall continue the case to the 12-month permanency hearing," if the court finds either that there is a "substantial probability" the child may be returned to his or her parent or legal guardian within six months, "or that reasonable services have not been provided." (*Ibid.*) The latter determination requires the court to decide "whether reasonable services that were designed to aid the parent or legal guardian in overcoming the problems that led to the initial removal and the continued custody of the child have

23

been provided or offered to the parent or legal guardian" and the court must either order them initiated, continued or terminated. (§ 366.21, subd. (e)(8).)

Here, both parents challenge the sufficiency of the evidence to support the order terminating reunification services to them.

Mother contends the reunification services she received were inadequate, because her social worker should have better tailored the case plan to her mental illness and been "more vigilant to assist the family," noting the social worker thought she wasn't taking her medication, observed mother's struggle with mental health during the case, and believed additional mental health services could be helpful if another six months were provided. Mother also contends the Agency failed to show by clear and convincing evidence under section 366.21, subdivision(e) that mother failed to make substantial progress in her case plan. Relatedly, she contends the trial court lacked discretion to set a section 366.26 hearing because there was a substantial probability S.L. could be returned to her within six months.

Father similarly contends (1) the Agency did not provide reasonable reunification services tailored to his family; (2) he was not given adequate support to successfully complete his case plan, because his social worker "mechanically did a minimal job in promoting success of the case plan and staying in sufficient and meaningful contact with me"; and (3) he made sufficient progress in his case plan to warrant additional reunification services. He also argues he is willing to separate permanently from mother if need be, which "is the hardest decision I have ever had to make, but I am now ready and willing to do so to save my parental relationship with our son."

We conclude there is no substantial evidence that reasonable services were provided to S.L.'s parents and do not reach the remaining issues.

## I.

### *Standard of Review*

We review the evidence most favorably to the Agency which is the prevailing party, and indulge all legitimate and reasonable inferences to uphold the trial court's order. (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1010, superseded by

24

statute as indicated in *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1504; *In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) If there is substantial evidence supporting the judgment, the court's order must be affirmed. (*In re Misako R.*, at p. 545.) " 'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citation.]" (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424 (*Tracy J.*).) "Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence." (*Ibid.*)

## II.

### *The Trial Court's Finding Mother Was Provided Adequate Reunification Services Is Not Supported by Substantial Evidence.*

The focus of California's dependency system during the reunification period is to "preserve the family whenever possible." (*Tracy J.*, *supra*, 202 Cal.App.4th at p. 1424.) "Until services are terminated, family reunification is the goal and the parent is entitled to every presumption in favor of returning the child to parental custody. [Citations.] After reunification services are terminated, the focus is to provide the child with a safe, permanent home." (*Ibid.*)

In arguing her reunification services were deficient, mother directs us to *In re K.C. v. J.P.* (2012) 212 Cal.App.4th 323 (*In re K.C.*), and contends her mental illness should have been the Agency's starting point for specifically tailored reunification services. We agree.

*In re K.C.* sets out the basic standard an agency must meet when providing reunification services to any parent. It must make a good faith effort to provide reasonable services responsive to the unique needs of each family, and the plan must be " ' "specifically tailored to fit the circumstances of each family" ' " and " ' "designed to eliminate those conditions which led to the juvenile court's jurisdictional finding." ' " (*In re K.C.*, *supra*, 212 Cal.App.4th at p. 329.) Specifically, the record must show it identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the

25

duration of the service plan, and made reasonable efforts to assist the parents when compliance is difficult. (*Id*. at pp. 329–330.)  The adequacy of the plan and the agency's efforts are judged according to the specific circumstances of each case.  (*Id*. at p. 329.)  And " '[t]he effort must be made to provide reasonable reunification services in spite of difficulties in doing so or the prospects of success.' " (*Ibid*.)

As made clear by both *In re K.C.* and the authorities it discusses, when a parent or guardian has a mental illness or a developmental disability, their condition must be the "starting point" for a family reunification plan which should be tailored to accommodate their unique needs.  (See *In re K.C.*, *supra*, 212 Cal.App.4th at pp. 332–333, discussing *In re Jamie M.* (1982) 134 Cal.App.3d 530, 540; *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1790; *Tracy J.*, *supra*, 202 Cal.App.4th at pp. 1425–1426; *In re Victoria M*. (1989) 207 Cal.App.3d 1317, 1329–1330.)

So, for example, in *In re K.C.*, a father's case plan expressed concern he suffered from mental illness and directed him to undergo a psychological evaluation, the results of which identified certain psychological conditions that impaired his ability to parent.  (*In re K.C.*, *supra*, 212 Cal.App.4th at pp. 326, 330.)  But the evaluation recommended offering reunification services, including a pharmacological evaluation to determine the extent to which the conditions might be helped by medication.  (*Ibid*.)  The father expressed resistance, and didn't think he needed medication, but ultimately agreed to cooperate.  (*Id*. at p. 327.)  Yet the mental health clinic to which the agency had directed him for the pharmacological evaluation turned him away, and the agency made no effort to get the recommended evaluation elsewhere.

In these circumstances, the court found no substantial evidence that reasonable services had been provided.  (*In re K.C.*, *supra*, 212 Cal.App.4th at p. 325.)  The court reasoned, "[t]he ' "problems leading to [his] loss of custody" ' [citation] all appeared to stem from his mental health issues.  The Department quite properly undertook to identify those issues.  But when it came to *addressing* them, the Department appeared to delegate the burden of finding and obtaining suitable services to Father himself—despite the high

likelihood that the very issues necessitating treatment would interfere with his ability to obtain it." (*Id*. at p. 330).

Nor was the agency excused by the father's stated opposition to medication. (*In re K.C.*, *supra*, 212 Cal.App.4th at pp. 331–332.) The only evidence was that the father had resisted initially. (*Ibid*.) "The Department made no attempt to show that Father would in fact have refused medication if presented with a choice between taking it and permanently losing custody of his children." (*Id*. at p. 331.) And the father eventually did try to get the evaluation but was unsuccessful. (*Id*. at p. 332.) In these circumstances, the agency "could not pounce upon stale expressions of reluctance as an excuse for its own inaction." (*Ibid*.)

Among the authorities *In re K.C.* relies upon is *In re Jamie M.* (1982) 134 Cal.App.3d 530, which in many ways resembles this case. It involved a mother who had a chronic schizophrenic illness, suffered from paranoid delusions, and turned herself and her children into police to protect them, apparently when she went off her medication. (*Id.* at pp. 536–537, 543.) In examining whether the court had a basis to remove the children from her custody, the court examined the complex, often ill-defined and poorly understood nature of schizophrenia, which is a category that encompasses a wide group of disorders and defies generalization (or even professional consensus) as to its causes, diagnosis, treatment and a patient's prospects for relapse, since every case is unique. (*Id.* at pp. 537–538.) "Because it may represent a collection of parts from several types of emotional disturbances rather than a single 'disease,' labeling some patients as schizophrenic may be equivalent to saying an accident victim with a concussion, fractured spine, broken ribs and a collapsed lung is 'severely ill.'" (*Id*. at p. 538).

For these reasons, the court in *In re Jamie M.* stressed that the mere fact the mother was labeled a schizophrenic "really tells us very little about her behavior and its affect [*sic*] on her children" and asked, "How then is a court to use this crucial and yet nebulous diagnosis in ruling on the proper disposition to be made of her children?" (*In re Jamie M.*, *supra*, 134 Cal.App.3d at p. 540.) And its answer sheds a great deal of light on what went wrong in this case: "It would appear that a diagnosis of schizophrenia should

be the court's starting point, not its conclusion.  Rather than mandating a specific disposition because the mother is schizophrenic, the diagnosis should lead to an *in-depth examination of her psychiatric history, her present condition, her previous response to drug therapy, and the potential for future therapy with a focus on what affect her behavior has had, and will have, on her children.*  [¶]  Harm to the child cannot be presumed from the mere fact of mental illness of the parent . . . . The proper basis for a ruling is expert testimony giving specific examples of the manner in which the mother's behavior has and will adversely affect the child or jeopardize the child's safety."  (*Id.* at p. 540, italics added.)

In this case, the problem that led to S.L.'s detention similarly was mother's mental illness, and more specifically her difficulty remaining medicated which precipitated her relapse.  So, taking mother's mental illness as a "starting point" (*In re K.C.*, *supra*, 212 Cal.App.4th at p. 333; *In re Elizabeth R.*, *supra*, 35 Cal.App.4th at p. 1790; *In re Jamie M.*, *supra*, 134 Cal.App.3d at p. 540), the Agency was required, first, to identify mother's mental health issues and provide services designed to enable her to obtain appropriate medication and treatment that would allow her to safely parent S.L. (*see In re K.C.*, at p. 330) and also, second, to provide services designed to help her stay on her medication.  It did not meet its burden to show that it took either step.

First, with respect to identifying mother's mental health issues and needs, nothing like the careful evaluation of mother's mental illness called for by *In re Jamie M.* was done by the Agency in this case, nor did the Agency even secure a psychological evaluation as part of a case plan as was done in *In re K.C.*

In some ways, this record is so wanting on the subject of mother's mental illness it defies analysis.  The Agency secured two mental health evaluations early on, but not as part of mother's case plan.  And even had the Agency sought that professional input in order to address mother's mental health needs as part of a reunification plan, that input still could not constitute substantial evidence that the Agency provided reasonable reunification services.  Leaving aside that the record contains no information about the full identity, qualifications or licensing of either doctor, their conclusions are not

28

described in the Agency's 12-page report other than three vague comments—opining generally about the severity of mother's symptoms and the potential danger she posed to S.L., her state of "denial" about her condition, and noting favorably that "she appears to be medication compliant but needs to remain so." So it is impossible to ascertain what, if anything, these examining psychologists might have concluded about what mother's condition *is*, what her treatment needs are and her prospects for reunifying successfully with her son. Substantial evidence isn't synonymous with "any" evidence. (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) And as far as we can tell, no therapist, clinician or mental health professional ever testified at any of the hearings in this case, including the critical six-month review hearing at which the trial court terminated reunification services.[12]

Mother's mental illness appears in this case to be so vaguely and inconsistently diagnosed, it appears she herself was the most well-informed of anyone. The petition alleged she "suffers from bipolar with persistent delusions along with command auditory hallucinations." The detention report said the hospital at one point had "narrowed down her diagnosis to Mood Disorder but they are not sure which one." According to the disposition report, mother reported that she had "OCD, bipolar, anxiety, depression, and schizophrenia." Mother testified she wasn't bipolar but schizophrenic, and told that to the hospital upon her discharge at the beginning of the case. Whatever her precise medical condition, there is no dispute mother suffered homicidal hallucinations. But we fail to see how the Agency could discharge its obligation to try to reunify mother with her

---

[12] We also note that even if the Agency had made a more complete record of Dr. Roy's and Dr. Morell's findings, it could not have supported a finding that mother still posed a risk to S.L. by the time of the six-month review hearing some months later. "[A] psychologist's *initial* assessment (completed before the parent has had the opportunity to meaningfully participate in reunification services) does not constitute substantial evidence of *current* detriment to the child. . . . The evidence must be viewed in light of the disabled parent's response to services and demonstrated ability to safely care for the child, despite that parent's labeled diagnosis, initial prognosis or eligibility for support services." (*Tracy J.*, *supra*, 202 Cal.App.4th at pp. 1424–1425.)

son, and provide reunification services appropriately tailored to her needs, without a clear diagnosis of her mental illness secured through an evaluation as part of a case plan.[13]

Compounding the problem, the parents' social worker, Ward, had unsubstantiated suspicions during the reunification period that mother had stopped taking her medication, but failed to ascertain whether this could be verified through a blood test.[14] And she admitted *she did not even know if mother was on the right medication*.[15] She also admitted that if a doctor told her mother was on the wrong medication her opinion "might" change, and yet there is no indication Ward ever sought to find out. Asked whether mother's behavioral changes could be due to her being on the wrong medication, she candidly admitted total ignorance: "It could be. Like I said, that's not my expertise." Ward's lax approach to understanding mother's mental illness and her treatment needs rivals the social worker in *In re K.C.*, who gave up after an initial mental health assessment and dispensed with a recommended pharmacological evaluation.[16]

Mother also cites *In re Daniel G.* (1994) 25 Cal.App.4th 1205, in which one agency's efforts to provide reunification services to a mentally disabled parent suffering

---

[13] A parent is "not required to complain about the lack of reunification services as a prerequisite to the department fulfilling its statutory obligations." (*Mark N. v. Superior Court*, *supra*, 60 Cal.App.4th at p. 1014.) Even so, we note that mother testified at the six-month review hearing she didn't agree with the two court-ordered evaluations and requested additional psychological examinations.

[14] Ward testified she raised her concerns with mother's social worker, Kays, whom Ward described as "the go-between" between the Agency and mother's psychiatrist, Dr. Sharman. According to Ward, Kays "said she didn't know, but she would try to find out if they've done any lab work. And the answer was that they have not. And so we don't know. We don't know if she's been taking her meds." Although mother didn't know if her current medication would show up in a blood test, she testified that her other medication had, she offered to take a blood test for the court, and the Agency introduced no evidence that a blood test would be ineffectual.

[15] She testified, "I'm not a medical professional, and I could be wrong. But I don't know if she's taking her medication or if it's even the right medication for her."

[16] We also note Ward's opinion that mother might have stopped taking her medication was conjectural, and does not constitute substantial evidence that mother had done so. (See *Roddenberry v. Roddenberry*, *supra*, 44 Cal.App.4th at p. 651.)

from schizophrenia were called a "disgrace." (*Id*. at p. 1216.) Although the mother in that case "appear[ed] to have serious emotional problems and realistically she may never be able to properly care for her son," the court criticized the agency in part because the social worker "had no idea whether [mother] was progressing toward an independent living situation" and "never asked [mother's] psychiatrist whether he believed [mother] would ever reach the point where she could care for [her son] and, if so, when." (*Id*. at p. 1216.) We see similar deficiencies in this case.

Even S.L.'s lawyer expressed concern that mother had not received adequate services, because "she hasn't been sent back to the doctor by the instruction of the social worker to say, you know, you've got—you've got an attitude issue here that maybe reflects the medication you're taking."

Just as expert opinion is required to determine whether a child can safely remain in the custody of a parent suffering from schizophrenia (*In re Jamie M*., *supra*, 134 Cal.App.3d at p. 540), the input of professionals is necessary for an agency to appropriately tailor reunification services to such a parent. The Agency here failed to show that it consulted with, and provided mother with access to, mental health professionals who diagnosed and prescribed her appropriate medication that would control her hallucinations and enable her to safely parent S.L. Nor did the Agency demonstrate that it consulted medical experts about the degree to which mother would pose a risk to her son, if any, if she remained medication compliant, and whether given mother's diagnosis she could be expected to remain on her medication.

Despite these open questions about mother's mental health needs, the trial court nonetheless found mother had made progress. It observed, "there's some good things to be said and, you know, she's on her meds now. And she's doing, apparently, better, although we did see her while she was being questioned starting to go off . . . ." But the court appears to have judged her based on whether her mental illness had been cured, not effectively managed: "So, you know, the point is there's some ups and downs in this— her mental health. And somebody who has been diagnosed with schizophrenia, hearing voices and telling the social worker that she might murder the kid, which, you know, *that*

31

*doesn't go away in six months. It doesn't go away with two weeks of meds*." (Italics added.) Even still, the court had no evidentiary basis to judge whether mother's mental illness *could* "go away" or be managed within six months or otherwise, because there is no competent evidence from any medical professional whatsoever on the subject.

The second major difficulty with the Agency's reunification efforts, even if the Agency had demonstrated it properly identified mother's mental health issues and medication needs, is that the record does not show the Agency made any effort to ascertain how mother could better manage her medications, nor did it provide services that could help enable her and father to do so. As we have noted, the immediate problem that led to S.L.'s removal from his parents' custody (see § 366.21, subd. (e); *In re K.C.*, *supra*, 212 Cal.App.4th at p. 329), was that mother was having problems staying on her medication, and we are required to indulge the inference that this difficulty was the result of her having overdosed without father knowing. The Agency was aware of this from the beginning, citing her doubling up on medication in the petition. Yet there is no evidence any of the services the Agency provided either parent were specifically designed to aid either one of them in improving their ability to ensure she took her medication as prescribed. A standard package of parenting, anger management and support-network programs, and even in mother's case continued treatment by her therapist and tele-psychiatrist, are no substitute for services specifically tailored to help this family devise carefully considered improvements to the safety measures that proved ineffective after the first case.[17] As stated in the authority cited to us by the Agency, its obligation to

---

[17] The record contains few specifics about the Safety Organized Practice program, but it does not appear the program was designed to help these parents more effectively manage and monitor mother's medication; and if it was so intended, the Agency did not meet its burden of so showing. According to the Agency's six-month review report, the SOP program was intended merely to help each parent "develop a positive support system that includes friends and family" by helping them identify at least two people they could turn to for help when they became "overwhelmed or stressed" in order to receive "encouragement, objective feedback, and help in accessing resources." In father's words, its purpose was to help them build a "safety net" or "support system." And Ward testified only that SOP meetings "can be very emotional. They're very draining for many

provide reasonable services encompasses a duty to "offer[] more intensive rehabilitation services where others have failed." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) One might expect at least a consultation with a mental health professional on the subject. Yet there is no indication the Agency took any steps to secure services to help evaluate whether a better system for monitoring mother's medications could be implemented, such as with the assistance of trained medical professionals if need be.[18]

In closing argument, the Agency's counsel tacitly conceded this was important. But rather than explain how the Agency met its duty to try to help, he blamed the parents: "There's an argument that they have in a perfunctory sort of way complied with their case plan. But 366.21[, subdivision] (e) is not asking for substantial compliance with the case plan; it's asking for progress on the case plan. It's asking for progress toward reunification. [¶] *And we are in the exact same situation we were back before this case was filed, where mother is more or less okay when she's on her meds, but there isn't a safety network in place to prevent her from going off her meds or just checking out and going to a hospital and leaving the kid with dad*." (Italics added.)

The Agency's argument to this court consists of a single sentence: that reunification services were reasonable and adequately tailored because the Agency "identified mental health as mother's primary area of need and arranged weekly therapy and monthly tele-psychiatric sessions for mother." We disagree. This record raises far more questions than it supplies answers about mother's mental health condition, her medication needs and the measures that might be appropriate to help ensure her

---

of us who are involved. It's a way to get to the core of the problem quickly. And then to rebuild." She also testified that "One of the questions is, what are your worries?"

[18] From all we can tell, mother took it upon herself to attempt to solve this difficulty, even though the Agency's duty to provide reunification services could not be delegated. (*In re K.C.*, *supra*, 212 Cal.App.4th at p. 330; *In re Monica C.* (1995) 31 Cal.App.4th 296, 307–308.) She testified that after she ran out of medications and experienced the relapse which precipitated this case, her own mother became involved in monitoring her medications as an additional safety measure, and there is no evidence mother stopped taking her medication since then, other than the Agency's unverified speculation that we have already described.

medication compliance. We cannot say in these circumstances the Agency met its burden to show it offered or provided mother adequate reunification services. The court therefore had no discretion to set a section 366.26 hearing, and was required to continue the case to the 12-month permanency hearing. (See § 366.21, subd. (e); *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424.)

## IV.

### *The Trial Court's Finding Father Was Provided Adequate Reunification Services Is Not Supported by Substantial Evidence.*

Much of what we have said with respect to the shortcomings of mother's reunification services applies equally to father. The petition alleged, in effect, he was in denial about the gravity of her mental illness. And, early on, it was brought to the Agency's attention father wasn't sufficiently monitoring her medications, as was apparently required by their previous family maintenance plan, which contributed to her disturbing relapse. However, as we have explained, it does not appear from this record the Agency offered or provided anything specifically targeted at helping these parents devise a more reliable means of making sure mother remained on her medication.

We also are troubled by the Agency's response to father's dismissiveness about mother's mental illness or the possible danger she posed to their son. And here, we are cognizant that " 'A "mechanical approach" to a reunification plan is not what the Legislature intended: "such a plan must be appropriate for each family and be based on the unique facts relating to that family." [Citations.] The effort must be made to provide suitable services, in spite of the difficulties of doing so or the prospects of success.' " (*In re Brittany S.* (1993) 17 Cal.App.4th 1399, 1406–1407, quoting *In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777.) We think the only reasonable inference to be drawn from the evidence, viewed in light of this entire record, is father thought mother was safe as long as she stayed on her medication, and based upon the evidence adduced at the six-month hearing, the trial court apparently agreed ("She appears to be lucid. She appears to be more in the moment. . . . She has it together now"). But even if that were not so, it was at least incumbent on the Agency to seek out and offer services that could help father

34

better understand and appreciate the gravity of the risk mother posed, through means such as individualized therapy, consultations with mother's own treating mental health team, or some other educational avenue. Without evidence of such services, we cannot say the Agency met its burden to show it offered and provided him reunification services "designed to aid [him] . . . in overcoming the problems that led to the initial removal and the continued custody" of his child. (§ 366.21, subd. (e).)

We also are concerned that the first judge who presided over the detention hearing suggested a psychological evaluation of father, and ordered "mental health service and treatment" without specifying either parent, yet there is no evidence father received a mental health evaluation thereafter or that the Agency sought to obtain one. (Cf. *In re K.C.*, *supra*, 212 Cal.App.4th at p. 325.) And, although we decline to reverse on this basis, we are equally concerned by the minimal amount of visitation ordered.[19]

Finally, there was of course the potential for father to single-parent S.L. by permanently separating from mother, which both mother and father testified they would be willing to accept. And father tells us in his brief, "That is the hardest decision I have ever had to make . . . ." Here again, however, there is no substantial evidence father

---

[19] No party has briefed the question whether S.L.'s parents should have been permitted more visitation than what appears to be the court's required five-hour minimum. We note, however, that both parents testified they asked for more; and in their petitions they each ask this court to order them visitation. The judge who presided over the case at the detention hearing, the second of three, "expects maximum visitation for the father" but puzzlingly ordered only the court's five-hour minimum for both parents. "Visitation is an essential component of a reunification plan." (*Tracy J.*, *supra*, 202 Cal.App.4th at p. 1426.) It has been held that a mere four hours of supervised weekly visitation is unreasonable in the absence of evidence the parents' behavior has jeopardized or will jeopardize the child's safety. (*Id*. at p. 1427.) And when an agency limits visitation in the absence of such evidence, "it unreasonably forecloses family reunification on the basis of the parents' labeled diagnoses, and does not constitute reasonable services." (*Ibid*.) Here, we believe the same is true of the amount of visitation permitted both parents in this case. We encourage the trial court on remand to reconsider and increase these parents' visitation to permit them the maximum visitation allowable, unless it finds either parent will physically endanger S.L. As to that, moreover, the trial court found father poses no such danger; therefore, unless circumstances have changed, there is no basis not to order greater visitation for father.

received support from the Agency to help him pursue that as a realistic option as an alternative, if mother's mental illness could not be safely and appropriately managed. The subject was discussed during the reunification period but it is unclear to what degree. And we recognize his relationship with mother was on-again, off-again, which appears to have been their social worker's reason for not pursuing the matter further. Likewise, the trial court at the six-month review hearing was bothered by father's statements at the outset of the case, in the March 6, 2015 disposition report, indicating he didn't want to parent S.L. alone. But it does not appear that either the Agency or the court ever put the option forward to father on pain of losing custody of his son (cf. *In re K.C.*, *supra*, 212 Cal.App.4th at p. 331), nor offered him services designed to help him attain that goal, such as mental health counseling that might assist him to separate from mother if need be. (Cf. *In re Monica C.*, *supra*, 31 Cal.App.4th at p. 310 [reunification services must "consider the possible merit of intermediate solutions which preserve some contact between parent and child"].) Moreover, "[a] forecast of failure could not provide an excuse for refusing to try." (*In re K.C.*, *supra*, 212 Cal.App.4th at p.332.)

We need not and do not decide whether father made sufficient progress toward reunifying with S.L. to justify continued reunification services for another six months. We note our concern, however, that the Agency's resistance to reunifying S.L. with his father alone stemmed largely from its criticisms of father's "inactive" parenting style, as demonstrated by the social worker's testimony we have already described. The goal of juvenile dependency law is not to impose a state-mandated philosophy of parenting. (See *In re Jasmine G.* (2000) 82 Cal.App.4th 282, 290; *In re Paul E.* (1995) 39 Cal.App.4th 996, 1005; § 300 [statement of legislative intent].) Minor criticisms of this sort are not substantial evidence S.L. could not be safely cared for by his father. (See *In re Jasmine G.*, at p. 293.) They are "trivial to the point of being pretextual." (*In re Paul E.*, at p.

36

1005.)  Moreover, the Agency's criticisms of father bear no connection to the reason S.L. was removed from his custody, which was his failure to protect S.L. from mother.[20]

In sum, we cannot say there is substantial evidence father was offered and provided reasonable reunification services either.  The court erred in terminating his reunification services and declining to continue the case for another six months.  (See § 366.21, subd. (e).)

## IV.

### *The Parties' Remaining Contentions*

We are mindful of the needs of a young child who has not once but twice been removed from his parents' custody.  That circumstance weighed heavily on the trial court as well.  But the Legislature did not "intend[ ] a speedy resolution of the case to override all other concerns including 'the preservation of the family whenever possible.' "  (*In re Daniel G.*, *supra*, 25 Cal.App.4th at p. 1214.)

Given our determination that neither parent was offered or provided reasonable services, it is unnecessary to decide whether there is substantial evidence that they "failed to participate regularly and make substantive progress" in their respective case plans, and we decline to address that issue. (§ 366.21, subd. (e).)  For similar reasons, it also is unnecessary to decide mother's related contention, framed as a challenge to the sufficiency of the evidence, that the trial court lacked discretion to set a permanency hearing because there was a substantial probability that her son may be safely returned within another six months. (§ 366.21, subd. (e).)

We do, however, note the unfortunate theme that emerges from this record, which is a breakdown in the parents' relationship with their social worker after she expressed

---

[20] It also appears that some of the Agency's criticisms of father's "inactive" parenting may have resulted from limitations arising from father's chronic back pain.  Yet the state has no power to remove a child from the custody of a physically disabled parent unless the parent's abilities are compromised to such an extent that the child is at substantial risk of harm.  (*In re Tyler R.* (2015) 241 Cal.App.4th 1250, 1265.)  The Legislature has declared, "a physical disability . . . is no bar to the raising of happy and well-adjusted children."  (§ 300 [statement of intent].)

concern as to whether they truly want to regain custody of their son. It is apparent to this court that they do, reflected among other ways by the fact of these petitions. Nevertheless, we do not condone mother's angry outbursts in the SOP meetings that Ward described. Nor do we believe Ward's candor justified mother and father in declining to participate further in those meetings, albeit recognizing they sought to enlist the help of counsel. Both parents expressed a willingness to set aside their past difference with Ward to work cooperatively with her if reunification services were continued. We encourage them to do so. Continued acrimony and distrust is not in anyone's interest, not the least a young child who has lived all but several months of his precious first three years under the supervision of the courts of the State of California.

## DISPOSITION

Let a peremptory writ of mandate issue, directing respondent court to (1) vacate its finding reasonable services were offered or provided to the parents; (2) vacate its September 28, 2015 order terminating reunification services and setting a permanency planning hearing under Welfare and Institutions Code section 366.26; and (3) order the Agency to provide further reunification services to the parents consistent with the views expressed in this opinion. We assume that on remand the court will reexamine the parents' visitation schedule in light of our directive to grant additional reunification services.

Our decision is final as to this court immediately. (Cal. Rules of Ct., rule 8.490, subd. (b)(2)(A).)

_____

STEWART, J.

We concur.

_____

RICHMAN, Acting P.J.

_____

MILLER, J.

Trial Court:   Del Norte County Superior Court

Trial Judge:   Hon. Leonard J. LaCasse

Counsel:

Law Offices of Jennifer Savoy and Jennifer Savoy for Petitioner Patricia W.

James Fallman for Petitioner J.T.

No appearance for Respondent.

Office of the County Counsel, Elizabeth Cable, County Counsel, Joel Campbell-Blair, Deputy County Counsel