Filed 5/23/23  In re J.A. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re J.A., a Person Coming Under the Juvenile Court Law. | B320295 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 21CCJP04641C |
| Plaintiff and Respondent, | |
| v. | |
| R.H., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Pete R. Navarro, Judge Pro Tempore of the Juvenile Court.  Affirmed.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

———————

Mother appeals from the juvenile court's order terminating her reunification services as to J.A. at the six-month review hearing under Welfare and Institutions Code section 366.21,[1] as well as a restraining order that restricted mother's visitation with her then-infant son J.A. to virtual visits. Mother contends the court erred in finding the Los Angeles County Department of Children and Family Services (DCFS) provided her with reasonable reunification services. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

Mother has three children: J.A. (born in 2021) and his half siblings T.H. (born in 2008) and R.H. (born in 2009). T.H. and R.H. are not the subject of this appeal, and J.A.'s father is not a party to this appeal.

### 1. *J.A.'s removal and the dependency petition*

DCFS most recently became involved with the family[2] in August 2021 when J.A.'s maternal half-sibling T.H. vandalized mother's home and ran away. Mother, who was nine months pregnant with J.A., felt threatened by T.H., could not control him, and did not want him in the home. Police also had been called to the home that month in response to a domestic violence

———————

[1] Statutory references are to the Welfare and Institutions Code unless indicated otherwise.

[2] DCFS had investigated mother before.

2

incident where J.A.'s father caused mother to fall while showering.

Mother, a veteran, has bipolar disorder. She received mental health and psychiatric services through the Veterans Health Administration (VA) and saw a therapist outside of the VA. She had stopped taking her psychotropic medication due to her pregnancy, but her therapist and mental health team were not concerned about her ability to parent. A DCFS social worker spoke to mother's VA case manager in late August 2021. She confirmed mother had not displayed behavior that would require a psychiatric hold and was meeting with her VA psychiatrist and outside therapist.

Mother gave birth to J.A. in early September 2021. The social worker spoke with mother's VA case manager and with the social worker from the hospital where J.A. was born. Both were concerned about mother's refusal to resume her medication. The VA case manager also relayed the doctor's concern that mother might have postpartum depression. The VA planned to monitor mother closely. They wanted to place mother on "other medications," but she refused because she wanted to breastfeed J.A.

The social worker saw mother in the hospital shortly after J.A.'s birth. The social worker tried to schedule a time to meet mother in her home and to set up a child family team meeting, but mother resisted. Over the next week, mother sent the social worker text and video messages discussing various personal issues, as well as screenshots of Facebook conversations. For example, mother said she felt overwhelmed and didn't know if she had postpartum depression; sent a photograph of herself driving with her children in the car; sent a video of herself on

3

the toilet, talking about sex acts between herself and J.A.'s father; and sent another video accusing J.A.'s father of stealing things and then recanting that accusation. Mother also accused the social worker of harassing her.

On September 22, 2021, T.H.'s and R.H's father contacted the social worker about his concern for mother's mental health. She had been "messaging a lot of nonsense" and did not sound stable. That same day, the social worker contacted mother's new VA case manager. The case manager shared she had spoken to mother two days earlier and mother was "doing okay without her medication." The case manager said she could not comment further about mother's mental health without a new release of information from her.

On September 29, 2021, DCFS obtained an order authorizing the removal of all three children. The social worker contacted mother, but she would not meet the social worker to release the children. Mother continued to send the social worker messages, including videos of herself making bizarre comments.

On October 1, 2021, mother was involuntarily hospitalized for evaluation and treatment under section 5150 after law enforcement stopped her for driving erratically with J.A. in her lap. Mother was naked. An individual had reported seeing mother dance naked in the street and then get into a car with the baby and drive off. Mother was incoherent, had difficulty answering questions, and lacked awareness of her actions. J.A. was taken into protective custody and placed with paternal great aunt. Mother was hospitalized for about 10 days and then arrested on October 12, 2021 for child endangerment and released three days later.

On October 5, 2021, DCFS filed a section 300 petition on behalf of all three children. Mother was not present at the October 8, 2021 detention hearing, as she remained hospitalized. Mother continued to refuse to take her medication. An attorney unsuccessfully tried to contact mother before the hearing. The juvenile court detained J.A. from parents and ordered monitored visitation for mother once she contacted DCFS.

Mother called and then met with the social worker on October 18, 2021. The social worker gave mother notices for the upcoming November hearings and a "resource packet for services." Mother asked about visitation. She blamed her mental health episode on the stress of dealing with the former social worker. She wanted to get a restraining order against him.

On November 1, 2021, the social worker told the DCFS dependency investigator (DI) that mother had been calling her "'dozens'" of times. Mother did not make sense and appeared delusional and paranoid. The social worker said mother "'seem[ed] to be off her medication.'" The social worker learned mother again had been involuntarily hospitalized at the VA. The DI contacted mother's VA case manager on November 4, 2021, but mother had forbidden the VA from talking to DCFS.

Mother left several messages for the social worker on November 12, 2021 which suggested she had been released from the hospital. Both the social worker and DI tried to call mother back a few days later, but her voicemail was full. DCFS thus had yet to arrange visitation for mother. The DI also had not been able to interview her.

The court continued mother's scheduled November 18, 2021 arraignment hearing because counsel had been unable to reach her. Mother went to a DCFS office on November 23, 2021,

however, asking for visitation. Mother was told to contact the social worker, but she didn't. Instead, mother called the DCFS hotline claiming J.A.'s father told her he would suffocate the baby if he didn't stop crying. The social worker called J.A.'s caregiver. Father was not in the home and another social worker was there with the baby. The caregiver mentioned mother had "show[n] up" with a suitcase at paternal grandmother's home where J.A.'s father was staying. When asked to leave, mother "ran up and down the street yelling Black Lives Matter."

The next day, mother called the DCFS office and asked to speak to the social worker's supervisor. Mother's thoughts appeared unclear, incoherent, and irrational. DCFS recommended the court suspend mother's visitation until she had an Evidence Code section 730 (section 730) evaluation[3] to ensure the children would be safe with her.

By the adjudication hearing on November 29, 2021, mother still had not appeared in court and had not been appointed counsel. The court sustained the petition, amended by interlineation, finding J.A. and his half-siblings were at risk of serious harm due to: J.A.'s father's violent conduct toward mother, and mother's failure to protect the children; mother's inability to care for or appropriately supervise T.H., who had emotional and behavioral problems and had run away several times; mother's endangerment of J.A. on October 1, 2021, when she drove with him on her lap; mother's history of mental and emotional problems, including diagnosed bipolar disorder, her involuntarily hospitalization on October 1, 2021, and failure to

---

[3] Section 730 authorizes the court to appoint an expert to investigate, render a report as ordered by the court, and testify.

6

take her prescribed psychotropic medication; and J.A.'s father's history of mental and emotional problems.

At disposition, DCFS again recommended mother undergo a section 730 evaluation before any visitation. Minor's counsel asked for DCFS to monitor visits. The court stated it would allow virtual video visits "until we get information that mother's psychiatric disorder is in check, but mother's behavior is clearly psychotic and unpredictable" placing "the child, . . . staff, . . . [and] mother at risk."

The court declared J.A. a dependent of the juvenile court, removed him from parents' custody, and ordered DCFS to provide family reunification services to parents. The court ordered mother to participate in mental health counseling, including a psychological assessment, psychiatric evaluation, and psychiatric treatment, and to adhere to a psychotropic medication plan.[4] The court also ordered mother to participate in a domestic violence support group for victims, individual counseling to address case issues[5]—if not provided through her mental health treatment—and parenting classes. Mother's visits with J.A. were to be virtual. Mother could visit J.A. in person "upon proof

---

[4]    The signed case plan checked the boxes for psychiatric assessment and psychiatric evaluation, but the court did not mention an assessment or evaluation when making its orders at the hearing. Rather, the court ordered mother "to participate in psychiatric treatment including adherence to a psychotropic medication plan."

[5]    Those issues included: domestic violence, mental health, safe parenting, and past trauma.

that her psychiatric disorder is under control." The court set a six-month review hearing for May 31, 2022.

## 2. *The six-month reunification period*

Mother told DCFS she was receiving mental health services through the VA. In December 2021, the social worker spoke to mother's previous case manager/therapist there, who described mother as unstable.[6] She was concerned about mother visiting the children. When told visitation would be virtual, she agreed "that was the best plan." She explained mother's behavior was "so severe," staff visited mother in pairs in a public setting. It was "clear" to her that mother was not taking her medication.

Mother's behavior continued to be erratic. She had "show[n] up" at J.A.'s caregiver's home "cursing and demanding a visit," and at J.A.'s father's job where she "attempt[ed] to run over the uncle." In March 2022, J.A.'s counsel, on behalf of J.A., asked the juvenile court to issue a restraining order to protect J.A., his caregiver, and the caregiver's daughter from mother. The application alleged that, on March 20, 2022, mother went to paternal grandparents' home and tried to take J.A. from his car seat while paternal grandfather was holding it. Mother then fought with other members of the paternal family, ultimately striking paternal grandmother. J.A. and his caretaker were in another room during the altercation and were not injured. Mother was arrested. Earlier, on March 14, 2022, mother had shown up outside paternal great aunt's home, stating she would take J.A. with her.

---

[6] Mother must have signed a new release for the VA to be able to talk to DCFS.

On March 24, 2022, the court signed the temporary restraining order after a hearing at which mother's appointed counsel appeared. Mother was not present. The TRO authorized mother to have monitored, virtual visits with J.A. Mother appeared with counsel on April 14, 2022. Counsel asked for a continuance, which the court granted. The court ordered DCFS to prepare a written visitation schedule.

At the continued hearing on May 4, 2022—at which mother appeared by telephone—the court made the terms of the TRO permanent for three years. Mother's counsel asked the court to allow mother to visit J.A. in person at a DCFS office with a DCFS employee monitor. Counsel noted such a young child—by then J.A. was almost eight months old—likely would not benefit from virtual visits. After recalling mother's "extreme psychiatric episode" where mother "disrobed" in the street and "took off" in a car with J.A. unrestrained, the court found mother's psychiatric condition posed "a danger to not only the child but to [the] staff" at the DCFS office. The court stated it would entertain a future motion to modify visitation and would re-address visitation at the upcoming review hearing. Mother filed a notice of appeal from the May 4, 2022 order.

In its status review report filed May 19, 2022, DCFS noted mother had not demonstrated progress or participation in her court ordered services nor demonstrated any behavior changes. The social worker had tried "to discuss and meet with mother about her case plan" 10 times between December 2021 and April 2022. Mother refused to meet with the social worker. The report noted mother continued to have unregulated emotions during her conversations with the social worker and made statements demonstrating she was not "attending to her mental needs."

9

Before the restraining order, J.A.'s caretaker had monitored mother's virtual visits and was told to allow mother at least 10 minutes to speak to J.A. The caretaker repeatedly had to end visits early due to mother's inappropriate conduct. After the restraining order issued, mother's twice weekly virtual visits with J.A. were monitored at the DCFS office by the social worker. After her visits, mother regularly would call the DCFS office to make various allegations. She also called the DCFS child abuse hotline about 14 times between December 2021 and April 2022.

Since January 2022, DCFS had been unable to discuss mother's progress with the VA. Mother had revoked her release to permit the VA to disclose information to DCFS. She signed a release on February 3, 2022 to allow DCFS to speak with her psychiatrist but immediately revoked it.

On April 3, 2022, however, mother told the social worker she had signed a new release that was good through the end of May. Two weeks later, on April 18, 2022, the social worker emailed the VA to confirm it had the release and to get the name of mother's psychiatrist but received no reply. That same day, mother gave the social worker her psychiatrist's name, Dr. Widmark. The social worker called but could not leave a message. A week later, the social worker tried again but was told Dr. Widmark was out of the office until April 28, 2022.

On May 4, 2022, mother went to the DCFS office and gave the social worker a letter from Dr. Widmark dated April 29, 2022. The psychiatrist stated he had assumed mother's psychiatric care at the VA in December 2021 and saw mother on a weekly basis, including that day. Mother was taking psychotropic medication by injection every four weeks. The doctor stated he would

10

"continue to follow her on a frequent basis." Mother told the social worker she had signed a release but because the social worker had been unable to confirm mother had done so, she asked mother to sign a new one. Mother became agitated and left.

DCFS recommended the court terminate mother's reunification services. When mother received the notice, she called the social worker upset, stating, " 'I don't believe the kid I am doing visits with is even [J.A.], I don't know what you did with my son. It doesn't make sense.' " The DCFS report notes that, although she appeared to love J.A., mother had not been able to show she could protect him and keep him safe. The report continues, "Mother is continuously unable to be redirected and lacks insight of the issues that brought her family to the attention of DCFS." The report notes the social worker had not been able to consult with Dr. Widmark about mother's progress in her treatment but does not indicate the social worker tried to call Dr. Widmark again.

### 3.    *Six-month review hearing*

The juvenile court held the six-month review hearing on May 31, 2022, as scheduled. Mother was present and represented by counsel. The court admitted into evidence DCFS's status review report and attachments, and the notices for the hearing. The court also admitted Dr. Widmark's April 29, 2022 letter, and a May 23, 2022 letter confirming mother had enrolled in a 10-session parenting class and completed one session.

Mother's counsel asked the court to return J.A. to mother's care, or to grant her further reunification services as there was sufficient evidence demonstrating a likelihood that J.A. would be returned to mother within the next six months. Counsel noted

11

mother was taking medication, "actively working to engage with the Department of Mental Health to receive individual counseling," and had enrolled in a parenting program. Counsel argued the evidence showed mother was at least in partial compliance with her case plan to the same extent as father, for whom DCFS had recommended continued reunification services.

Counsel also asked that mother be permitted some in-person visitation with J.A. Counsel noted the virtual visits were not productive and not "serving the underlying purpose of reunification" given the child's young age and the earlier-issued restraining order. Counsel "believe[d]" the court could "tailor" a visitation order that allowed mother to visit J.A. in person while "also keeping in mind the age of the child for safety and security."

The court asked counsel why mother insisted on making child abuse allegations about J.A. Counsel believed mother simply was concerned for the well-being of her child, as she could see him only briefly by video. The court responded, "This looks like obsessive behavior." Counsel noted mother had seen her baby only virtually in the care of an individual with whom she did not have a great relationship. Counsel asked the court to allow mother to bond with her very young child.

Counsel then said he was surprised the court did not order a section 730 evaluation at disposition. He argued, "It seems that would have been beneficial in understanding and providing preventive services for mother." Counsel conceded he had not been appointed until after disposition and thus had not been able to make that argument. He asked the court either to continue reunification services or to order a section 730 evaluation to determine if "additional orders [were] needed based" on the evaluation.

12

Minor's counsel asked the court to terminate mother's reunification services.  She was concerned by mother's inappropriate behavior during the virtual visits and mother's behavior that led to the restraining order.  Counsel also did not know whether mother was receiving regular therapy other than her visits with her psychiatrist because mother refused to sign the release for the VA.  Counsel for DCFS also noted it could not "get a true sense of any type of progress" for mother because she had revoked her consent to share information with DCFS, and DCFS had been unable to reach Dr. Widmark.

After hearing argument, the court found returning J.A. to parents would create a substantial risk of harm to him.  The court found, "Although mother has been participating in the court ordered functions, it does not appear that there has been any benefit in these services to mother.  Mother's behaviors indicate that there is still some very serious deep rooted psychiatric issues that need to be addressed."  Mother then addressed the court,

> "How would you feel if your newborn baby was ripped away from you because your wife was beating you?  How would you feel?  And then your wife threatened to kill your baby.  Would you not call C.P.C. daily to make sure that your baby was alive?  And you see witnesses on the video visits and that you see your baby with red marks all over him.  Wouldn't you be concerned, your Honor?  Because that is all[—]I was concerned with my baby, my infant, because I have not been able to hold him, touch him, smell him, to see if his arms and legs are moving."

"And I have been compliant with my treatment [and] case plan. I have been doing everything. And not to play the blame game, but [the] DCFS office has not been very resourceful for me, as they have been for father."

The court then found by clear and convincing evidence that DCFS had complied with the case plan by making reasonable efforts to return J.A. "to a safe home." The court also found there was not a substantial probability that the child would be returned to mother in the next six months and terminated her reunification services. Mother appealed.

## DISCUSSION

### 1. *Applicable law and standard of review*

"When a child is removed from a parent's custody, the juvenile court ordinarily must order child welfare services for the minor and the parent for the purpose of facilitating reunification of the family. (§ 361.5, subd. (a).) For a child under three years of age at the time of removal, as [J.A.] was, reunification services are presumptively limited to six months." (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 843 (*Tonya M.*); § 361.5, subd. (a)(1)(B) [court ordered services must be provided "for a period of 6 months from the dispositional hearing . . . ., but not longer than 12 months from the date the child entered foster care," unless the child is returned home].) This is because the " ' "unique developmental needs of infants and toddlers" ' [citation] justifies a greater emphasis on establishing permanency and stability earlier in the dependency process." (*M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 175 (*M.V.*).)

14

The Department "must make a good faith effort to provide reasonable services responsive to the unique needs of each family, and the plan must be ' " 'specifically tailored to fit the circumstances of each family' " ' and ' " 'designed to eliminate those conditions which led to the juvenile court's jurisdictional finding.' " ' " (*Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 420 (*Patricia W.*).)  The record must show DCFS "identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the duration of the service plan, and made reasonable efforts to assist the parents when compliance was difficult." (*Ibid.*)  The adequacy of a reunification plan and the reasonableness of DCFS's efforts "are judged according to the circumstances of each case." (*Ibid.*)

Moreover, "when a parent . . . has a mental illness or a developmental disability, that condition must be the 'starting point' for a family reunification plan." (*Patricia W., supra*, 244 Cal.App.4th at p. 420.)  "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)  DCFS must show by clear and convincing evidence that reasonable reunification services have been provided. (§ 366.21, subd. (e)(8) [juvenile court "shall determine by clear and convincing evidence whether reasonable services . . . have been provided or offered to the parent"].)

When a child cannot be returned to the parent at the six-month review hearing, the court must "determine by clear and convincing evidence whether reasonable services that were designed to aid the parent . . . in overcoming the problems that

15

led to the initial removal and the continued custody of the child have been provided or offered to the parent." (§ 366.21, subd. (e)(8); § 366, subd. (a)(1)(B) [at each status review hearing the court shall determine "[t]he extent of the agency's compliance with the case plan in making reasonable efforts . . . to return the child to a safe home"].) If they were, the juvenile court may terminate reunification services for the parent of a child under three and set a section 366.26 hearing upon finding "by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan." (§ 366.21, subd. (e)(3); *M.V.*, *supra*, 167 Cal.App.4th at p. 176 [juvenile court may but is not required to schedule a section 366.26 hearing].)[7] The court must continue reunification services to the 12-month review hearing, however, if the court finds (1) reasonable services were not provided, or (2) there is a "substantial probability" the child "may be returned to their parent . . . within the next six months." (§ 366.21, subd. (e)(3).)

We review the juvenile court's finding that reasonable services were provided for substantial evidence. (*Patricia W.,* s*upra,* 244 Cal.App.4th at p. 419.) Because that finding had to be established by clear and convincing evidence, we review the record as a whole to determine if it "contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.) In doing so, we must view the record in the light most favorable to DCFS as the prevailing party, "and give appropriate deference to how the trier of fact may have evaluated

---

7 Here, as father's reunification services were continued, the court did not set a section 366.26 hearing.

the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at pp. 1011–1012.)

### 2. *Mother did not forfeit her challenge to the reasonable services finding*

DCFS initially contends mother forfeited her challenge to the adequacy of her reunification services because she did not object to them or ask the court to make a finding of no reasonable services. We disagree. Mother was neither present nor represented at the disposition hearing, but she objected through her counsel to the court's termination of her reunification services. Counsel also questioned why mother had not received a section 730 evaluation. Counsel specifically asked the court to continue reunification services or order a section 730 evaluation to determine if mother required other services based on the evaluation. In contrast, the parents in the cases on which DCFS relies did not object at all. (See, e.g., *In re Lauren Z.* (2008) 158 Cal.App.4th 1102, 1110 [parent's attorney did not object at time services were terminated and, when asked, had no information to give the court that would allow it to find a substantial possibility that the child might be returned at the 12-month date]; *In re Kevin S.* (1996) 41 Cal.App.4th 882, 885 [parent, represented by counsel, raised no objection when court terminated reunification services and set matter for section 366.26 hearing and submitted matter on DCFS's recommendations].)

### 3. *Mother forfeited her challenge to the May 4, 2022 restraining order and any challenge to its visitation restriction is moot*

Mother appealed from the May 4, 2022 restraining order that limited her to virtual visits with J.A. During the pendency

17

of this appeal, in January 2023, the juvenile court ordered mother was authorized to have monitored, in-person visits with J.A. for a minimum of two times per week, two hours per visit. We asked the parties for supplemental briefing, which they provided, as to whether we should take judicial notice of the minute order, and whether mother's objection to the May 4, 2022 order's restriction of her visitation with J.A. to virtual visitation is moot. The parties agreed we may take judicial notice of the court's January 6, 2023 minute order, and mother conceded her challenge to the ordered virtual visitation is rendered moot by that order.

We now take judicial notice of the court's January 6, 2023 minute order granting mother in-person visitation with J.A. (*In re Josiah Z.* (2005) 36 Cal.4th 664, 676.) To the extent mother's request that we direct the court to order in-person visitation is based on a viable challenge to the court having ordered virtual visitation, that claim is moot as we can provide no effective relief to her. (*In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1315–1316.)

In any event, as DCFS noted, mother made no argument in her opening brief as to why the court erred in entering the May 4, 2022 order. We thus treat the appeal from that order as forfeited and do not consider it. (*Telish v. State Personnel Bd.* (2015) 234 Cal.App.4th 1479, 1487, fn. 4 [failure to raise argument in opening brief forfeits the issue on appeal]; see also, e.g., *In re Adrian L.* (2022) 86 Cal.App.5th 342, 344, fn. 1 [although notice of appeal included appeal from order denying section 388 petition, parent forfeited any claim of error where opening brief presented no argument on that issue].)

18

**4.** ***The record supports the court's finding by clear and convincing evidence that DCFS provided reasonable services***

Mother argues DCFS provided inadequate services because it made no effort to secure a psychological evaluation for her to assess her mental health diagnosis and to form a treatment plan "that would be conducive to facilitating reunification with [J.A.]." She also argues the virtual visitation ordered was not adequate to foster a bond between her and her baby or to facilitate reasonable reunification.

As an initial matter, to the extent mother argues the juvenile court erred in not ordering a section 730 evaluation and in-person visitation, mother has forfeited that argument. Virtual visitation and the absence of a section 730 evaluation were part of the court's disposition order. Because mother did not appeal from that order, she may not attack the case plan itself now. (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1018 [" 'By failing to appeal, [mother] has waived any complaint she may have regarding the [reunification] plan as ordered.' "]; *In re Jesse W.* (2001) 93 Cal.App.4th 349, 355 ["an unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order"].) Accordingly, we focus on DCFS's actions in reviewing whether substantial evidence supports the juvenile court's reasonable services finding. (*Sara M.,* at p. 1018 [considering challenge to agency's actions in reviewing finding of reasonable services rather than the services ordered].)

Mother's discontinuance of her medication for a year due to her pregnancy and failure to resume taking it after J.A.'s birth—combined with possible postpartum effects—appears to be what

19

led to mother's erratic and sometimes aggressive behavior.[8] DCFS thus was required to make a good faith effort to provide mother with services designed to help her ameliorate her psychiatric symptoms so that she could safely parent J.A. Substantial evidence in the record supports the finding that it did.

First, the record shows DCFS made stabilizing mother's psychiatric symptoms the starting point for mother's reunification plan and tailored the plan to address her needs. At the filing of the dependency petition, DCFS recommended mother "[s]ubmit to a psychological/psychiatric evaluation with follow-up treatment as recommended." The court declined DCFS's later request to require mother to submit to a section 730 evaluation before visiting J.A.—finding virtual visitation would ensure his safety—but ordered, as part of mother's case plan, a psychological assessment, a psychiatric evaluation, individual counseling—if mother's mental health treatment did not provide it—and for mother to take all prescribed psychotropic medications. The record also shows mother received referrals for these court-ordered services. In its May 2022 status review report, DCFS stated it gave mother "referrals for community

---

[8] Indeed, during the investigation of the current case, R.H.— then age 12—told the DI " 'everything was fine' " when mother " 'was on her medication.' " Mother was " 'angry,' " however, when " 'off her meds,' " and had slapped R.H. for the first time, to R.H.'s shock.

20

resources," including "[p]arenting classes," "[i]ndividual counseling," and "[p]sychiatric assessment and treatment."[9]

However, DCFS does not appear to have directed mother to undergo a psychiatric or psychological assessment, nor does its report state she received one. But mother already had access to mental health services—including psychiatric care and prescribed medication—through the VA. Indeed, Mother told DCFS she was receiving mental health services through the VA. Moreover, DCFS was aware of mother's longstanding bipolar diagnosis, that she had stopped her medication due to her pregnancy, and that she had been—and continued to be—under the regular care of the VA. Mother's most recent hospitalization before the adjudication hearing also had been at the VA. The court thus impliedly could find DCFS reasonably relied on mother's *existing* mental health care team to provide her court-ordered mental health services rather than require mother to undergo an evaluation through one of its referrals.

In fact, mother had received mental health services from the VA for her bipolar disorder since at least 2015. As noted in the jurisdiction/disposition report, mother had a manic episode triggered by the death of her grandfather in June 2015. The report noted mother received weekly mental health services through the VA, and her case manager confirmed mother was compliant with her medication and stable. As mother was able

---

[9]     It's not clear, however, whether those "community resources" referred to the "resource packet for services" the social worker gave mother on October 18, 2021, or if the social worker gave mother referrals to the specified services at some later date.

to "stabilize[ ]" and safely care for her children, a dependency case was not opened.

There is no evidence in the record suggesting mother had another mental health crisis between 2015 and the 2021 events. As the VA had been successfully providing mother with mental health services to treat her bipolar disorder, apparently for years, DCFS and the court could infer the VA was in the best position to address mother's current mental health issues and to help her resume regular medication use.

The record also shows mother in fact received services designed to remedy the problems that led to J.A.'s removal through the VA. Moreover, DCFS was in contact with the VA about mother's diagnosis and treatment at the outset of its involvement and continued to consult with the VA—to the extent mother permitted—throughout the reunification period.

The VA closely monitored mother both during her pregnancy and after J.A.'s birth when she would not take her medication due to her pregnancy and desire to breastfeed. At the beginning of the reunification period in December 2021, mother was seeing her psychiatrist more often than other VA clients did because "they [were] trying to get her stable." Mother remained noncompliant with taking her psychotropic medication, but her providers at the VA continued to work with her as best they could given her "severe" symptoms. And, according to Dr. Widmark's April 29, 2022 letter, mother continued to participate in weekly psychiatric care up to the date of the letter. Thus, we can infer the court impliedly found mother had been receiving regular psychiatric care throughout the reunification period. Significantly, by at least April 2022, the VA also had been successful in getting mother to take her medication regularly

by giving her a monthly "depot formulation" injection.[10]  Her psychiatrist was evaluating her medication needs on a frequent basis.  These were precisely the type of services "designed to remedy" the problems that led to J.A.'s removal.  (*Patricia W., supra*, 244 Cal.App.4th at p. 420.)

Nevertheless, mother contends DCFS's failure to secure a psychological or psychiatric evaluation for her alone supports reversal of the court's reasonable services finding.  Mother argues DCFS's " 'starting point' " should have included " 'an in-depth examination of [her] psychiatric history, her present condition, her previous response to drug therapy, and the potential for future therapy with a focus on what [e]ffect her behavior has had, and will have, on her children.' "  (Quoting *In re Jamie M.* (1982) 134 Cal.App.3d 530, 540.)

But mother thwarted DCFS's efforts.  After December 2021, the social worker had no access to mother's mental health providers—despite having made several efforts to contact the VA —because mother had revoked her release that allowed the VA to disclose information to DCFS.  DCFS's hands were tied.  Without a release, the social worker could not assess whether the VA was meeting mother's specific needs or even if mother was participating in the available services.  Nor could the social worker consult with mother's mental health team about mother's medication regimen, whether her psychiatric condition had

---

[10]  An injection of a depot formulation is a slow-release form of medication, allowing the medication to act for a longer period. (See Oxford Reference (2023) <https://www.oxfordreference.com/ display/10.1093/oi/authority.20110803095711608?rskey=XymJit &result=3> [as of May 22, 2023], archived at <https://perma.cc/ 99NK-55FK>.)

23

stabilized so that she could safely visit J.A. in person, or if she required other services to enable her to do so. And, as mother refused to discuss her case plan with the social worker—despite the social worker's repeated attempts to do so—DCFS could not find out any of that information directly from mother.[11]

Not until April 3 and April 18, 2022, respectively, did mother purportedly sign a new release for the VA and give the social worker Dr. Widmark's name. Yet, after the social worker could not confirm that information with the VA, or reach Dr. Widmark, mother would not sign another release despite the supervising social worker's explanation that, as the client, mother could ask for a letter from her psychiatrist but DCFS required a release to consult with him.

Thus, as DCFS asserts, "[t]here was no way for DCFS to assist mother or to better tailor services to mother's specific needs where mother made it impossible for DCFS to work with herself or her service providers." Mother's repeated failures to cooperate with DCFS's efforts to ensure she received the services she needed did not render those efforts or the services she received unreasonable. (See *In re K.C.* (2012) 212 Cal.App.4th 323, 330 (*K.C.*) [recognizing the "reasonableness of the services provided may depend to some degree upon the parent's willingness to cooperate in the completion of his or her reunification plan"]; see also *In re Nolan W.* (2009) 45 Cal.4th 1217, 1233 [agency cannot force parents to participate in services offered as part of their case plan].)

---

[11] The social worker tried to discuss mother's case plan with her twice in late December 2021, twice in January, four times in February, once in March, and once in April 2022.

The cases on which mother relies to support reversal of the juvenile court's reasonable services finding, *K.C.* and *Patricia W.*, are distinguishable. In *K.C.*, a child welfare agency directed a father, who *appeared* to suffer from mental health issues, to undergo a psychological evaluation and follow any treatment recommendations. (*K.C., supra*, 212 Cal.App.4th at pp. 326, 329.) The evaluation recommended father undergo a psychiatric examination to determine if psychotropic medication might alleviate the psychological conditions the evaluation had identified. Citing father's initial opposition to taking medication, the agency made no effort to help him secure the pharmacological evaluation after a public mental health clinic found he did not meet their treatment criteria. (*Id.* at pp. 329, 331.)

The appellate court found that, while the agency identified the mental health issues that likely led to the removal of the father's children, it failed to provide him reasonable services to ameliorate those issues. (*K.C., supra*, 212 Cal.App.4th at p. 330.) The court noted the agency essentially had delegated "the burden of finding and obtaining suitable services to [f]ather himself— despite the high likelihood that the very issues necessitating treatment would interfere with his ability to obtain it." (*Ibid.*) Moreover, father's initial reluctance was not "an excuse for [the agency's] own inaction," and father in fact had tried to get the recommended evaluation. (*Id.* at pp. 331–332.) The court noted the agency "was required to make a 'good faith effort,' including ' "reasonable efforts to assist the parents in areas where compliance proved difficult," ' . . . regardless of 'the prospects of success.' " (*Id.* at p. 332.)

In *Patricia W.*, the appellate court similarly held the record did not support finding a social services agency provided

25

reasonable reunification services to a mother whose child was removed after the mother ran out of her psychotropic medication and experienced a relapse of "schizophrenic episodes" involving violent delusions, including voices telling her to kill her child. (*Patricia W., supra*, 244 Cal.App.4th at p. 401.) The mother there had received "vague[ ] and inconsistent[ ]" diagnoses (*id.* at pp. 406, 423) and had tried various medications (*id.* at p. 410). Her difficulty with taking her medication consistently, which precipitated her relapse, was the main issue that had led to her child's detention. (*Id.* at pp. 401, 422.)

The court observed "the [a]gency was required, first, to identify mother's mental health issues and provide services designed to enable her to obtain appropriate medication and treatment that would allow her to safely parent [her child] [citation] and also, second, to provide services designed to help her stay on her medication." (*Patricia W., supra*, 244 Cal.App.4th at p. 422.) The agency failed to show it took either step. (*Ibid.*) Specifically, there was no evidence the agency "sought to diagnose mother's mental illness and her medication needs," or secure a psychological evaluation, as part of a case plan. (*Id.* at pp. 401, 422–424.) Nor did the agency show "it consulted with, and provided mother with access to, mental health professionals who diagnosed and prescribed her appropriate medication," or consulted with medical experts about whether mother would pose a risk to her son if she remained medicated or if she could be expected to remain compliant. (*Id.* at p. 425.) Nor did the agency demonstrate it did anything to investigate or ameliorate mother's failure to take her medication. (*Ibid.*)

26

First, in contrast to the parents in both these cases, mother's bipolar disorder diagnosis was longstanding and well-known to both the VA and DCFS. And, from what we can tell, she had been successfully controlling her symptoms with medication prescribed through the VA since at least 2015 until she stopped in 2021 due to her pregnancy. In contrast, the father in *K.C.* never was assessed to determine whether medication would help his newly-diagnosed conditions, and the mother in *Patricia W.*—who had a history of difficulty with her medication—didn't receive access to professionals who could evaluate whether her diagnosis and prescribed medication were appropriate.

Second, mother was not left to fend for herself, like the father in *K.C.*, to secure mental health services. As we said, mother was an established client of the VA and had ongoing access to—and had been receiving—mental health services since before J.A.'s birth and throughout the reunification period. Not only could DCFS and the court reasonably infer the VA had evaluated mother's diagnosis and prescription medication needs during her ongoing care there—as evidenced by her psychiatrist's letter—they also could infer mother had received some type of psychiatric/psychological evaluation and/or assessment when she was involuntarily hospitalized. (See § 5152, subd. (a) ["A person admitted to a facility for 72-hour treatment and evaluation under the provisions of this article[, including section 5150,] shall receive an evaluation as soon as possible after the person is admitted and shall receive whatever treatment and care the person's condition requires for the full period that they are held."].)

Moreover, in stark contrast to the agency in *Patricia W.*, the record demonstrates DCFS made reasonable efforts to consult with mother's health care professionals:

- in August 2021 DCFS consulted with the VA about mother's diagnosis and current treatment;
- in September the social worker consulted with the VA and hospital after J.A.'s birth;
- in October the social worker spoke with the mental health and hospital social workers when mother was placed on an involuntary psychiatric hold;
- in November DCFS contacted the VA about mother's second hospitalization, and after being told mother would not allow the VA to talk to DCFS, contacted a Ms. Donald at the VA's compliance office to request information;
- in December 2021 the social worker consulted with the VA, as we discussed;
- in January 2022 the social worker contacted the VA only to learn mother again had revoked her release of information;
- in February the social worker spoke to Ms. Donald to try to get information;
- in April the social worker tried unsuccessfully to reach Ms. Donald two times to confirm mother had signed a new release for the VA and to confirm the name of mother's psychiatrist;
- in April the social worker also tried unsuccessfully to reach mother's psychiatrist, Dr. Widmark; and
- in May, the social worker left another two unreturned messages for Ms. Donald.

Thus, despite mother's resistance, DCFS did not give up on its efforts—as the agency in *K.C.* had—to ensure she received the

services she needed.  Nor is there any evidence that mother ever was turned away from, or had difficulty securing, mental health services or prescription medication.

We recognize mother was distraught over her inability to see her baby in person—to physically hold and touch him. And, her mental illness may have driven, at least to some extent, her distrust of DCFS.  (*K.C., supra*, 212 Cal.App.4th at p. 330 [parent's "less-than-full cooperativeness was itself a product of psychological conditions"].)  But here, mother was receiving psychiatric services designed to help her overcome her unstable mental health so that she could reunify with J.A. Yet, mother refused—for some unknown period—to take the medication prescribed to her, refused to cooperate with DCFS's attempts to consult with the VA for a significant portion of the reunification period, and would not discuss her case plan with the social worker. (See, e.g., *ibid*. [explaining that "[h]ad [f]ather refused to submit to the recommended medication evaluation, or refused to take such medications as might be recommended, his refusal would presumably have sustained a finding that reasonable services were provided"].)

And, although mother participated in mental health services mandated by her case plan—and eventually restarted her medication—substantial evidence also supports the court's finding that the possibility of mother being able to take custody of J.A. in the next six months was unlikely. Mother had threatened to take J.A. and assaulted his grandmother only a couple of months before the six-month review hearing.  She also

continued to act inappropriately during virtual visits with J.A.,[12] make unfounded calls to the child abuse hotline, and engage inappropriately with the social worker. As of mid-May 2022 —when DCFS completed its status review report—mother continued to demonstrate she was "not attending to her mental needs," which in turn "imped[ed] [her] progress in addressing the case issues that brought her family to the attention of DCFS."

Could DCFS have done more—perhaps made greater attempts to reach mother's psychiatrist and confirm she had been properly evaluated or tried alternative methods to communicate with mother? Certainly. But, "[i]n almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect." (*In re Misako R.*, *supra*, 2 Cal.App.4th at p. 547.) However, "[t]he standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*Ibid.*) Given mother's receipt of weekly psychiatric treatment and prescribed medication—through her preferred and longstanding provider— her refusal to discuss her case plan with DCFS, and her on-again-off-again attitude toward allowing the VA to share information with DCFS—and considering the record as a whole in the light most favorable to DCFS—we conclude substantial evidence supports the juvenile court's finding by clear and convincing evidence that DCFS made reasonable efforts to provide mother reasonable reunification services.

---

[12]     Mother appears to have attended all her virtual visitation sessions with J.A.

30

Mother's situation is a sad one.  But, as our high court explained, "We have long recognized that providing children expeditious resolutions is a core concern of the entire dependency scheme.  [Citations.]  If this is true of dependency cases in general, it is doubly true for the very young." (*Tonya M., supra,* 42 Cal.4th at p. 847, fn. 4.)

## DISPOSITION

The juvenile court's May 31, 2022 order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EGERTON, J.

We concur:

EDMON, P. J.

BENKE, J.[*]

---

[*]     Retired Justice of the Court of Appeal, Fourth District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.