Filed 07/10/23  G.H. v. Superior Court CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| G.H. et al.,<br><br>    Petitioners,<br><br>        v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | G062417<br><br>(Super. Ct. No. 20DP1488)<br><br>O P I N I O N |

Original proceeding; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Dennis J. Keough, Judge.  Petition denied.

Martin F. Schwarz, Public Defender, Richard Cheung, Assistant Public Defender, Brian Okamoto, Deputy Public Defender, for Petitioner G.H.

Juvenile Defenders and Donna P. Chirco for Petitioner G.R.

Leon J. Page, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

No appearance for Minor L.R.

\* \* \*

G.R. (Mother) petitions this court for a writ of mandate to compel the superior court to vacate its order setting a permanency hearing (Welf. & Inst. Code, § 366.26, subd. (a), all further statutory references are to the Welfare and Institutions Code), for her daughter L.R.[1]  Mother argues the juvenile court erred by setting a permanency hearing because she was not offered reasonable services.  We conclude sufficient evidence supports the court's order.  We deny the petition.

## FACTS

Mother's only contention is she was denied reasonable services.  Thus, we limit our discussion of the facts accordingly.

### I.  Protective Custody Warrant

A protective custody warrant sought to remove five-year-old L.R. from Mother and Father.  The social worker alleged Mother and Father had a history of domestic violence, and there was a criminal protective order and a restraining order protecting Mother and L.R. from Father.  The social worker stated that despite the orders, Mother had contact with Father and allowed him to care for L.R.  Mother told the social worker Father poked her buttocks with a tool and L.R. witnessed this and other abuse.  Mother showed the social worker a BB gun and knives Father used to threaten her.  The social worker said Father had unresolved substance abuse issues.  She added Mother

---

[1]  G.H. (Father) filed a letter brief joining in Mother's writ petition.  We provide only those facts concerning Father that are relevant to Mother's arguments.

2

denied substance abuse issues but admitted she used methamphetamine. The social worker opined Mother had unresolved mental health issues. She said L.R. had a speech impediment. Father denied domestic violence. Additionally, Mother told the social worker that she suspected her ex-boyfriend sexually abused L.R. and she contacted the police. The social worker asserted L.R. was at risk in her parents' care. The court approved the protective custody warrant removing L.R. from her parents' care.

## II. Petition/Detention

In November 2020, the Orange County Social Services Agency (SSA) filed a petition alleging L.R. was a child as described in section 300, subdivisions (b)(1) (failure to protect), (g) (no provision for support), and (j) (abuse of sibling). The petition alleged Mother and Father engaged in ongoing domestic violence in L.R.'s presence and both were in violation of the orders protecting Mother and L.R. from Father. It alleged Father and Mother had unresolved substance abuse issues; Mother had a 2004 driving under the influence (DUI) conviction. It also alleged Mother had unresolved mental health issues. The petition alleged Mother failed to address L.R.'s speech impediment and failed to care for L.R.'s half sibling who had special needs. The petition alleged both Mother and Father had criminal histories and Father was incarcerated. Finally, it alleged Mother's ex-boyfriend may have sexually abused L.R.

The detention report stated Mother told the social worker that Father poked or stabbed her buttocks with a tool and the wound was infected. The social worker explained Mother and Father had been in a relationship for seven years but had been living apart for five years. She said there were two orders protecting Mother and L.R. from Father, but Mother and Father were in regular contact until his recent incarceration on drug charges. She added Mother's ex-boyfriend obtained a restraining order against Mother. The social worker opined Mother exhibited mental health issues, including extreme paranoia. Mother told the social worker that she had not pursued the referral to

3

treat L.R.'s speech impediment. The social worker reported L.R.'s whereabouts were unknown.

At a hearing, the court concluded L.R.'s placement in the home was contrary to her best interests and vested temporary custody with a care facility. The court ordered Mother eight hours of monitored visits and no visitation for Father until he was released from custody. The court set a jurisdiction hearing for January 13, 2021.

### III. Jurisdiction/Disposition

In the jurisdiction/disposition report, SSA recommended sustaining the petition, declaring L.R. a dependent, and providing reunification services to Mother and Father. The social worker stated L.R. was placed with a non-relative extended family member (Caregiver).

The social worker reported that during an interview, Mother exhibited signs of mental health issues, displaying mood changes. She said Mother admitted to past methamphetamine use three times, but denied she was under the influence and said she would test. Mother suffered a DUI conviction in 2004. Mother told the social worker that Father was in jail, but he was "free like the wind" because he knew people in county and federal courts that helped him get out of jail. She also told the social worker that Father knew a man named "Obdulio" who was "'very powerful'" and connected with people in the county, which is "'corrupt[].'" Mother admitted L.R. was present during Father's physical and verbal assaults. Mother said that in 2016, she resided at a domestic violence shelter and completed a program. Mother told the social worker she was homeless and had been living in a car from 2019 to May 2020 when a friend allowed her and L.R. to live with her. Mother told the social worker that Father would find her and L.R. but she would not contact the police because he threatened her. Mother added, "law enforcement 'do their job but that the higher up people release the father because of money.'" Mother wanted to go to the media because of the corruption.

4

Mother told the social worker that the previous month, Father took L.R. and told Mother that if she reported him to the police, he would take L.R. to Mexico. When the social worker asked Mother why she allowed Father to take L.R. in violation of the restraining order, Mother said she was in the hospital because the wound on her buttocks was infected. Mother said she was in the hospital for about five days but she escaped because "the doctor was working with the powerful people from Orange County." Mother told the social worker she got L.R. from Father and went to Long Beach because Father "knows many people in Orange County" and "'there is no justice in Orange County.'"

The social worker stated Mother admitted Father physically assaulted her in L.R.'s presence and she violated the orders by allowing Father to have contact with them. Mother denied she had a substance abuse problem but agreed Father did. Mother also denied she had mental health issues. Mother attributed her failure to seek treatment for L.R.'s speech impediment to the coronavirus disease 2019 (COVID-19) pandemic and made other excuses for her failure. As to her ex-boyfriend's sexual abuse of L.R., Mother said she reported it to the police. Mother refused to discuss L.R.'s half-sibling. Mother denied she had a criminal history. Father denied any domestic violence.

As to visitation, the social worker reported that shortly after L.R. was placed with Caregiver, Mother arrived one night to see L.R. Although it was late, Caregiver agreed. When Mother told L.R. that she was going to take her to the park, L.R. agreed to go. Caregiver said L.R. could not go, and Mother grabbed L.R. and began to leave. Caregiver called the police.

The social worker reported Mother signed her case plan services and agreed to participate in counseling, parent education, a personal empowerment program (PEP), mental health services, random drug testing, and an outpatient substance abuse program. The social worker was angry at the emergency response social worker who was on

5

Father's side.  The social worker reported that in December of 2020, she provided Mother with referrals for the various services.

At the jurisdiction hearing, Mother and Father pleaded nolo contendere to the amended petition (§ 300, subds. (b)(1) [failure to protect] & (j) [abuse of sibling]).[2] The court found the allegations true and that L.R. fell within section 300, subdivisions (b)(1) and (j).  The court set a contested disposition hearing for February 23, 2021.

The contested disposition hearing did not occur on that date.  The court continued the matter three times, once because Mother's counsel was unavailable, once because Mother was hospitalized, and once because the court was otherwise engaged.

Addendum reports described Mother's visitation with L.R., who was with Caregiver, from December 2020 to May 2021.[3]  Those reports also detailed Mother's other services during the period.

In January 2021, the social worker asked Mother if she was participating in therapy.  Mother was agitated and exclaimed she would not participate in therapy because the police did not do anything regarding her allegations L.R. was sexually abused. Mother stated she would not participate in any services unless the court ordered them, and she would not take any classes because she was a good mother, she was not crazy, and she never did drugs.  During another conversation that month, Mother yelled at the social worker that she was lying in the report.  The social worker gave Mother a list of shelters.  Mother did not show up for several compliance visits.

That same month, Dr. Lilia Carey reported to the social worker that she had a telephonic intake appointment with Mother.  Carey stated Mother was resistant to services and admitted she was only participating because she was advised it was the only

---

[2] The substance abuse allegation against Mother was stricken.  The petition was amended to allege Mother may have mental health issues.

[3] Father was released from jail during this period.

way to reunify with L.R. Carey said she would continue to treat Mother but she might have a mental health disorder.

The following month, Carey told the social worker she had been unable to treat Mother because she was so distressed and scattered. She explained Mother needed to be stabilized on medication before they could work on her trauma. Carey reported nothing had changed the following month because she was still trying to arrange for Mother to see a psychiatrist. She added Mother had no insight concerning her role in L.R.'s removal from Mother's care.

In April 2021, Carey reported Mother seemed more stable. She said Mother claimed the doctor had advised talk therapy instead of medication and she was able to address how to cope and protect L.R.

The following month, Carey reported Mother was making an effort at complying but they met only because Carey forced her. She opined Mother has a different crisis every week and it hindered her progress in addressing the sexual abuse. She said Mother "'was just livid that I had been placed in her report saying that she had made no progress in the sexual abuse.'" Mother was able to refocus and calm down. Carey opined Mother had made slight progress. When the social worker told Carey that Mother seemed to be regressing, Carey said Mother seeks attention and control, and when she does not get them, she believes the world is out to get her and she becomes emotional. Carey attributed this to childhood trauma and said Mother requires long term therapy.

Mother began drug testing in December 2020. She tested positive for alcohol three times in January 2021. But she did not have any positive or missed tests until April 2021 when she stopped testing. Mother denied using drugs or alcohol. Mother was participating in PEP and parenting education.

Mother stated she did not have mental health issues and initially refused to participate in mental health services. However, in March 2021, Mother told the social

7

worker that she had a mental health assessment at the Orange County Health Care Agency (HCA) and was informed she has a lot of trauma and would benefit from extensive therapy and medication. Mother stated she was referred to Medi-Cal for services, but she was unclear as to what services she needs. The social worker told Mother to obtain a written recommendation from the HCA, which she agreed to do. Later, Mother told the social worker the assessment recommended therapy and requested a referral. The social worker again asked Mother to obtain a written recommendation from the HCA, which Mother again agreed to do. In May 2021, Mother told the social worker that she had already provided her with the written recommendation stating she did not meet the criteria for services. The social worker said Mother had not provided it and to submit it again.

At the May 2021 disposition hearing, the court declared L.R. a dependent child, removed custody from her parents, vested custody with SSA, and ordered reunification services for her parents. Mother's case plan included counseling, a domestic violence program, a PEP, mental health evaluations, a parenting education program, substance abuse outpatient treatment, and alcohol testing for 60 days. The social worker noted Mother had completed the parenting program and PEP and satisfied her counseling requirement because she did not qualify for additional mental health services. The court ordered Mother have supervised visits twice weekly and if she complied with visitation rules and did not discuss the case or disparage Father or Caregiver, she could begin two hours unsupervised in 30 days. The court set a six-month review hearing for November 22, 2021.

In an interim review report, the social worker, Daniela Aranda Soto, reported Carey scheduled the in-person meeting with Mother, but she never showed up. Carey said she would terminate Mother because she had met the six-month limit. Carey could have requested an extension, but she recommended a licensed and specialized counseling provider (LSCP). She stated Mother completed some treatment goals but did

8

not address the sexual abuse allegations because she always had a crisis. Carey explained Mother believed L.R. was sexually abused but addressing it triggered her own trauma history and she could not self-regulate and became overwhelmed. In June 2021, Carey recommended Mother undergo an Evidence Code section 730 evaluation (730 evaluation). Soto received Carey's termination report in July 2021.

Soto reported Mother stated she was undergoing alcohol monitoring and did not drink or use drugs. Mother insisted she did not need to complete an outpatient substance abuse program. Soto reported that SSA recommended a 730 evaluation for Mother.

*IV. 6- and 12-month Hearings*

In the six-month review report, SSA recommended continuing reunification services, finding suitable placement, ordering a 730 evaluation for Mother, and scheduling a 12-month hearing. Soto opined Mother made moderate progress on her case plan. Soto discussed the LSCP counseling referral with Mother to address SSA's involvement, L.R.'s sexual abuse, and self-regulation. Mother said she had already completed what was asked, but she would participate. Soto submitted an LSCP referral.

In August 2021, Mother's LSCP, Joseph Marquez, reported he was terminating her for three "'no shows'" and not completing her intake appointment within 30 days. Soto got Mother reinstated and encouraged her to continue with her therapy.

In September 2021, Marquez reported Mother was participating in weekly therapy, but she had a lot of work to do because of all the trauma she suffered. Mother shared her life experiences. She admitted to domestic violence with Father, but denied drug use. She did not mention anything about sexual abuse. Mother told Ramirez this situation she was going through had been false and SSA and law enforcement made up all the allegations. Marquez said Mother had little insight as to why SSA was involved.

The following month, Marquez reported Mother had paranoia, was unable to control her emotions, and indicated she was psychotic. He stated that when Mother

discussed her past, she screams, cries hysterically, and makes hand movements like she is attacking someone. Mother believes everyone is plotting to get her in trouble. He stated they set goals, but Mother would not be able to meet them if she did not progress by self-regulating. Marquez recommended Mother get a psychological evaluation, and might need medication.

That same month, Mother reported her counseling was going well and she had been working on controlling her anxiety, impulses, distrust, and fears. Mother previously told Soto that she had provided another social worker a letter from her mental health assessment that stated she did not meet the criteria for services; Soto did not have it. Soto recommended the court order a 730 evaluation.

Soto reported Mother said she completed a parent education program and she already knew everything they discussed, including to never yell at a child or use physical discipline. Mother said she completed PEP and people never changed and she would not tolerate someone disrespecting or hitting her. Mother regularly checked in with her parent mentor. Soto stated Mother completed her alcohol monitoring and was waiting to have the bracelet removed. Soto detailed Mother's visitation with L.R., which included 12 hours of supervised visits.

At the November 2021 six-month review hearing, the court continued the hearing to January 26, 2022, because L.R.'s counsel requested a contested hearing.

In a January 2022 addendum report, Soto reported Mother denied any contact with Father but Mother claimed she saw L.R. with Father; the criminal protective order was active to June 2022. Caregiver and Father reported a few instances of Mother seeking out and observing or approaching Father.

In November 2021, Mother told Soto that she consistently attended therapy with Marquez. Mother said they were discussing domestic violence and L.R.'s sexual abuse. When Soto asked about her psychological evaluation, Mother denied he made that recommendation and she never agreed to take medication. Soto told Mother it was in her

10

case plan and the therapist recommended it. That same month, Marquez reported Mother had a lot of anxiety and paranoia and was always going through a crisis. He believed that if L.R. were returned, Mother's dysregulation would be too much for L.R. because she had manic episodes and posttraumatic stress disorder (PTSD) responses. Marquez reported he told Mother that he recommended a psychological evaluation. Mother initially told him that she would do it but then she declined. Marquez would try again.

The following month, Mother told Soto that Marquez gave her resources for a psychiatric evaluation. Mother was amenable to the evaluation. Marquez reported Mother continued to do well and she understood why she needed to be evaluated. However, Mother believed "medication was only for crazy people." When Marquez gave Mother resources for an evaluation, she said she would go to the same location she went the last time. Marquez opined it would be a danger to return L.R. to Mother because she "'presents being impulsive, dysregulated, manic and paranoid.'" He could not make a diagnosis but said Mother presented as bipolar with psychosis or PTSD.

Later that month, Mother told Soto that Father, his boss, and another social worker made up everything in the petition and it was "'a trap.'" She stated, "'My mistake was that I did not flee the [c]ountry.'" Mother said she consistently attended therapy and they discussed domestic violence and sexual abuse. Mother stated she had been through a lot and she gets emotional when talking about these topics. Mother said she was working hard to change her behavior and was using breathing exercises. Mother told Soto she had a psychiatric appointment the following week. Soto encouraged Mother to go. Soto included the form to request a 730 evaluation for Mother with the January 2022 addendum report.

At the January 26 six-month review hearing, the court continued the hearing to March 4, 2022, because Mother was seriously ill and not present.

In a March 2022 addendum report, Soto reported she spoke with Marquez in January 2022. Marquez stated Mother completed 20 sessions and the last session was

11

her third "'no show.'" He recommended Mother have ongoing therapy because she needed to work on regulating her emotions. Mother always talked about the system being corrupt and her case was a conspiracy. Marquez encouraged her to schedule a psychological evaluation, but he did not think she did. He opined her primary diagnosis was PTSD and other diagnoses were unclear. Mother told Soto she completed her counseling with Marquez and learned to control her emotions. Mother missed her psychological evaluation appointment because she was sick. Soto encouraged her to reschedule and communicate if she needed help. Mother became upset and said Soto wanted the evaluation, not the court, and Soto could not ask her to do the evaluation. When Soto tried to explain, Mother interrupted and said everything was a plan to take L.R. away from her.

In February 2022, Soto asked Marquez if he would be able to see Mother. He said he did not have space and Mother needed someone who could be available for her more than once a day. Soto left a voicemail for another therapist inquiring about his availability.

Later that month, Soto told Mother that Marquez recommended ongoing therapy and a psychological evaluation. Mother agreed she needed ongoing therapy because she suffered a lot of trauma and Marquez's treatment helped her. Mother said she went to a place where they told her that she was not eligible for psychological evaluation because she had completed two evaluations and did not meet criteria both times. Soto asked Mother to get something in writing, and Mother said she would. When Soto recommended a 730 evaluation, Mother said she was willing.

At the March 4 six-month review hearing, the court ordered a 730 evaluation for Mother when SSA provided the paperwork. The court continued the hearing to April 25, 2022, for a six-month and 12-month review hearing.

In an April 2022 addendum report, Soto stated SSA's recommendation had changed. SSA recommended there was a substantial probability of return by the 18-

12

month review, suitable placement, and to schedule an 18-month review hearing. SSA believed Mother would benefit from a 730 evaluation and conjoint counseling with L.R.

In March 2022, Mother told Soto she was not looking for Father and planned to request an extension of the criminal protective order. Soto told Mother about the court authorizing a 730 evaluation. Mother asked why she had to do it when she was told she did not meet the criteria. Soto said her previous therapists recommended it. Soto encouraged Mother to have the 730 evaluation. Later, Mother texted Soto a picture of what appeared to be a letter from the HCA stating she did not meet the criteria for mental health services.

That same month, L.R.'s therapist told Soto that she had made numerous attempts to speak with Mother about attending a session, but Mother had not returned the calls. Soto talked to Mother about participating in conjoint therapy. L.R.'s therapist reported she spoke with Mother and invited her to join a session. Soto submitted a conjoint therapy referral.

Mother's visitation with L.R. at Olive Crest and with Caregiver was spotty. She interacted well with L.R. but was not always engaged and missed many visits.

At the combined six-month and 12-month review hearing, the court continued the case to May 23, 2022, because Mother's counsel was absent due to illness.

In a May 2022 addendum report, Soto reported L.R.'s therapist stated Mother attended her first collateral session. The therapist said Mother verbally attacked Caregiver in front of L.R. During the session, Mother spent most of the session discussing why SSA was involved and was more concerned with Soto being notified of her attendance. Mother engaged minimally with L.R. L.R. had a speech assessment scheduled.

At the May 23 combined six-month and 12-month review hearing, the court continued the matter to July 13, 2022, for a combined six-month, 12-month, and 18-month hearing because SSA's recommendation changed.

13

In a minute order dated July 1, 2022, the court noted it previously ordered Mother have a 730 evaluation when SSA submitted the paperwork. The court stated, "SSA filed the 730 evaluation paperwork via ex parte, however, this paperwork was misplaced prior to the court ordering the 730 evaluation." The court stated SSA resubmitted the paperwork. The court again ordered a 730 evaluation for Mother and the report be due by August 19, 2022. The court appointed Dr. Roberto Flores de Apodaca to complete the 730 evaluation.

In a July 2022 addendum report, SSA recommended continuing the matter for 60 days for completion of Apodaca's report. Soto reported that in May 2022, she told Mother to seek counseling at a Family Resource Center or inquire with her attorney to have the court authorize funds for ongoing counseling. Mother stated she would ask her attorney. Mother said she was open to having the 730 evaluation but had not heard from anyone. The following month, Mother told Soto she would begin therapy at Camino Nuevo. Mother said she missed her intake appointment but would reschedule. When Soto encouraged her to attend conjoint counseling with L.R., Mother said she thought it was court ordered. When Soto said it was encouraged, Mother said of course she could attend. Soto later reported they had an intake appointment that same month.

Mother continued to have 12 hours of supervised visits per week but visited inconsistently. Mother was occasionally late, did not show up, and was aggressive and rude with Caregiver in L.R.'s presence. Soto approved Mother's request to have a friend (Friend) supervise visits.

L.R. gave differing answers as to whether she liked visits or wanted to see Mother. She did not want to live with Mother. She appeared comfortable in her placement and was doing well.

At the July 2022 combined six-month, 12-month, and 18-month review hearing, the court continued the matter to September 12, 2022. The following month, Apodaca sent the court a letter stating that because of COVID-19 and other family

14

illnesses he was unable to complete the report. He requested a four-week extension or to be relieved. The court granted the request, ordered the report due September 22, 2022, and indicated it would reschedule the review hearing.

In a September 2022 addendum report, Soto opined Mother made moderate progress on her case plan. Soto reported that in July 2022, Mother left her a voicemail stating she was aware the court ordered a 730 evaluation and Soto needed to refer her to ongoing counseling. The following month, Soto stated Alejandra Anacleto, the conjoint therapist, said she treated Mother but it was difficult because Mother wanted to talk about her case and not L.R.

Mother's visitation performance had not changed—it was inconsistent. Caregiver reported there were occasions when Friend was not present when she picked up L.R. Soto reported L.R. told Caregiver that Mother's friend "'Guero'" was present during visits. Caregiver saw a man but could not identify him because "he always has a hoodie on."

L.R. reported Mother's male friend "Guero" or "El Guero" was present during visits. Mother denied having any unauthorized persons at the visits. L.R.'s attitude about living with Mother had not changed.

At the September 2022 combined six-month, 12-month, and 18-month review hearing, the court continued the matter to October 13, 2022, for completion of Apodaca's report. Apodaca filed his report.

SSA filed a section 388 petition requesting the court remove Friend as Mother's visitation supervisor. In the request, Soto stated L.R. said Mother and Father visit together when Friend supervises visits. Soto also said Mother's friend named "'El Guero'" attended visits. Soto stated El Guero may be Mother's ex-boyfriend who allegedly sexually abused L.R.

15

*V. 18-month Review*

In an October 2022 addendum report, SSA recommended terminating reunification services, funding suitable placement, and setting a section 366.26 hearing (.26 hearing). Soto reported Anacleto stated Mother last attended a session on September 15, 2022, called to let them know she was not going to make it on September 22, 2022, then did not call or show up on September 29. She said Mother had not met her goals because she was always late and always went off topic. Anacleto planned to request an extension so Mother could meet her goals.

Mother's visitation performance remained inconsistent. When Soto asked L.R. whether she would like to live with Mother, L.R. stated she wanted to stay with Caregiver. She also said she would like to live with Father. L.R. said Mother and Father once visited her together. L.R. appeared comfortable with Caregiver and continued to do well. Caregiver reported L.R. had no developmental concerns and her speech continued to improve.

At the combined six-month, 12-month, and 18-month review hearing, the court continued the matter to November 29, 2022. The court granted SSA's request to remove Friend as Mother's visitation supervisor.

In an October 2022 interim review report, Soto requested the court adopt an updated case plan, which was similar to the prior case plan and added a recommendation to have a "reality-oriented" therapist based on the 730 evaluation. Soto left voicemail messages with Carey, Marquez, and Anacleto. Carey reported she did not utilize reality-oriented approach because that is used to treat schizophrenia. Carey used cognitive behavior therapy (CBT), which Mother struggled with. Soto reported Father stated he had communication with Mother but denied plans to be in a romantic relationship with her.

The court approved the updated case plan. The court noted SSA would continue to search for a therapist who could provide reality-oriented therapy.

16

In a November 2022 addendum report, Soto reported that neither Anacleto nor Marquez could offer Mother reality-oriented therapy. In October 2022, Soto inquired whether LSCP Patricia Hikita could provide reality-oriented therapy to Mother. Hikita indicated she had never heard of this therapy and believed it had to do with sessions being based on reality. Hikita however said she was able to offer services to Mother. The next day, Soto called Mother to obtain consent to submit a counseling referral. Soto could not leave a voicemail because the voicemail was full. Soto texted Mother a picture of the referral and asked her to give authorization.

The following month, Mother told Soto that she would not sign the LSCP referral unless the substance abuse and sexual abuse points were removed. Soto told Mother the referral listed what the sustained petition listed, but if Mother submitted to an on-demand test, then the substance abuse allegation in the referral might be redacted when the results were received. Mother refused to do the on-demand test stating there was no point and she would rather wait for court.

Soto reported Anacleto stated she received the authorization for extension but Mother had two "'no shows'" in October 2022. Anacleto said there was a dynamic difference when Mother did not attend: L.R. was calmer instead of being slightly dysregulated by not following directions. Anacleto said that when Mother had her third no show in November, she had to terminate her. She said they were never able to address the sexual abuse because of Mother's lack of attendance.

Soto met with Mother in person or telephonically for monthly compliance contacts despite Mother cancelling, rescheduling, not showing up, or not responding to messages. Mother asserted she had done nothing to warrant L.R. being removed from her care.

Mother's visits remained inconsistent, and Caregiver reported Mother did not follow visitation guidelines. Soto reported Father said he planned to be in Mother's life until L.R. was grown. Father said Mother completed her services and L.R. needed to

17

be returned to her care. Father was looking for an apartment for Mother and L.R. and he planned to pay their rent. Father told Soto that he understood his case plan, but he did not intend to do any services because it was a waste of time.

The contested 18-month permanency hearing began in November 2022. Soto testified over several days in November and December 2022, and January 2023. Mother testified over numerous days in January, February, and March 2023. We discuss the relevant portions of their testimony anon.

During the pendency of the hearing, SSA submitted two addendum reports. Soto stated SSA remained concerned about Mother's inability to protect L.R. from physical, emotional and sexual harm. Soto explained that although Mother had successfully completed court ordered services, Mother was unable to address sexual abuse in therapy because she could not control her emotions when discussing her trauma. SSA was also concerned that Mother would expose L.R. to domestic violence because she resumed contact with Father, who refused to complete any services. SSA stated that because Mother's visitation became more inconsistent she failed to demonstrate she could prioritize L.R.'s needs ahead of her own. Finally, SSA opined Mother had not addressed her mental health appropriately. Soto opined Mother had made moderate progress on her case plan.

Soto reported that in October 2022, Apodaca completed the 730 evaluation and determined Mother has histrionic personality traits. Apodaca stated, "'[I]t is unfortunate that [M]other is so emotionally volatile, but because this is a reflection of her personality make-up and not a transient psychiatric condition that could respond to medications and therapy, I would not expect much change in her manner of behavior.'"

In December 2022, Mother sent Soto a text message stating the man L.R. called El Guero was not the same person who allegedly sexually abused her. Mother said L.R. had never been sexually abused. Mother discovered a morbid video and acted appropriately by reporting it and having L.R. checked.

18

Soto stated that in January 2023, Mother sent her a text message with a picture of the LSCP referral, signed, but with information from the justification box scratched out. Later that month, Soto attempted to speak to Mother to schedule a compliance contact, but there was no answer. Soto left a voicemail requesting a call back.

L.R. continued to give differing answers as to whether she liked visits or wanted to see Mother. L.R. did not want to live with Mother. L.R. said she liked Caregiver more.

Soto reported L.R. continued to do well and appeared comfortable in her placement. Caregiver stated L.R. had no developmental concerns and her speech continued to improve.

At the hearing, Soto testified that although Mother had done her case plan services, her behavior had not changed and she had not gained any insight or taken responsibility for why SSA was involved. Soto said Mother was erratic, angry, aggressive, and resistant to feedback. Soto estimated her interactions with Mother were 30 percent positive and 70 percent negative. Soto said she constantly tried to meet Mother for compliance visits. She provided Mother with resources and referrals, maintained communication with her, L.R., and Caregiver, collaborated with Mother's therapists, and made sure Mother received her visitation hours.

Soto testified Mother successfully completed counseling, PEP, parenting class, and alcohol testing, but she did not understand why SSA was involved or address the issues that brough them into the system. Soto testified Mother's therapists stated she had not gained any insight as to why SSA was involved. Soto did not re-refer Mother to another PEP class or parenting class because it was not needed. Based on Mother's 2004 DUI, her admission she used methamphetamine, her positive alcohol tests, and her demeanor when they spoke, Soto still believed Mother had a substance abuse issue. Soto also said Mother was inconsistent with participating in collateral sessions with L.R. and

19

her therapist. Soto did not believe Mother should receive more services because she had already received over 18 months of services without sufficiently progressing or changing her behavior.

Soto explained that after Apodaca diagnosed Mother with the unresolvable histrionic personality trait, she submitted a referral for reality-oriented therapy, which would have helped Mother with planning but would not have addressed the risks that caused L.R.'s removal. Soto referred Mother to a therapist who could offer this therapy.

Soto had not liberalized Mother's visitation because Mother had not demonstrated L.R. could be safe with Mother if visits were liberalized. Soto opined Mother's visits were inconsistent and had been deteriorating for months. Soto stated Mother was untruthful about having unauthorized individuals at the visits because she saw an unknown man at a visit.

Soto stated Mother had not addressed the domestic violence and she knew Mother had contact with Father when the domestic violence protective order expired in June 2022. Soto was concerned that Mother had not addressed how she would protect herself from Father.

Mother testified she had completed all her programs and they were useful. Mother liked Soto very much but Soto was confrontational, did not help in reunification, and ignored her reports. Mother discussed with Soto what she learned in parenting class and PEP class. She testified about what she learned in PEP class, conjoint therapy, and sexual abuse therapy. She stated Apodaca told her that she was a strong woman who should prepare herself for when L.R. was returned to her care. She never had a drug problem, never used methamphetamine, and never told anyone she used methamphetamine at Father's direction.

Mother testified L.R. was removed from her care because of domestic violence. She stated though that all the incidents of domestic violence occurred before L.R. was born in 2015. She said there was no domestic violence in 2019 or 2020.

20

Mother denied Father carved or cut her buttocks in 2020, which led to the dependency petition. Later, however, Mother testified Father had hit her, pulled her hair, and stalked her. Mother admitted that while she was pregnant with L.R., Father hit her and urinated on her. She stated that in 2016, Father physically attacked her in the car while L.R. was present. She said that in 2019 he knocked down the door of her house, hit her, and burned a mattress. Mother testified the last incident of domestic violence was in 2020 when Father raped her and stabbed her buttocks with a sharp tool

Mother testified she never had anyone unauthorized at visits. The man who L.R. saw was not her ex-boyfriend. Mother said Soto mistakenly thought she still saw her ex-boyfriend.

During her testimony, Mother lost focus, was nonresponsive, went off on tangents, and had to be redirected to answer the question. On occasion Mother got agitated and loud or emotionally distraught and cried.

The juvenile court began by stating that "what [was] dramatic [was] the disconnect between the beginnings and ends of [M]other's testimony." The court found Mother's testimony not credible. The court explained that although Mother had engaged with her case plan and participated in therapy, she did not embrace services in a meaningful manner and continued to believe she was the victim of a fraud and conspiracy. The court opined that as a result, she failed to gain any insight as to what caused L.R. to be removed from her care or accept responsibility. The court concluded that because of Mother's lack of insight, she could not protect L.R. from violence and other forms of abuse and neglect. The court found by clear and convincing evidence that SSA provided Mother reasonable services at the six-month, 12-month, and 18-month intervals. The court noted that although Mother completed her services, it would not characterize her progress as moderate. The court mused that since July 2022, Mother's performance had deteriorated. The court concluded L.R. could not be returned to Father

21

because of his unwillingness to engage in services. The court terminated reunification services and set a .26 hearing for July 12, 2023.

## DISCUSSION

Mother argues the juvenile court erred by setting a permanency hearing because she was not offered reasonable services. We disagree.

"[W]henever a child is removed from a parent's . . . custody, the juvenile court shall order the social worker to provide child welfare services" to the parent deemed eligible for reunification services. (§ 361.5, subd. (a).) "[An agency] must make a good faith effort to provide reasonable services responsive to the unique needs of each family, and the plan must be ""'specifically tailored to fit the circumstances of each family'"" and ""'designed to eliminate those conditions which led to the juvenile court's jurisdictional finding.'"" [Citation.] Specifically, the record must show the agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the duration of the service plan, and made reasonable efforts to assist the parents when compliance was difficult. [Citation.] The adequacy of the plan and the agency's efforts are judged according to the specific circumstances of each case. [Citation.] . . . [Citation.] And "'[t]he effort must be made to provide reasonable reunification services in spite of difficulties in doing so or the prospects of success.'" [Citation.]" (*Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 420.)

"In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547 (*Misako R.*).) "'Reunification services are voluntary . . . and an unwilling or indifferent parent cannot be forced to comply with them. [Citations.]' [Citations.]" (*In re Ronell A.* (1995) 44 Cal.App.4th 1352, 1365.)

22

A juvenile court must find SSA provided reasonable reunification services based on clear and convincing evidence. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971.) "'Under this burden of proof, "evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind." [Citation.]' [Citation.]" (*Ibid.*) We review a juvenile court's finding for substantial evidence. (*Ibid.*)

Here, substantial evidence supports the juvenile court's conclusion SSA provided Mother reasonable services.[4] There was overwhelming evidence SSA identified the problems leading to Mother's loss of custody of L.R., offered services to Mother designed to remedy the problems, Soto maintained reasonable contact with Mother during the duration of the service plan, and Soto made reasonable efforts to assist Mother when compliance was difficult.

SSA provided Mother with referrals and resources for numerous services including individual counseling, conjoint counseling, PEP, parenting class, substance abuse testing, a parent mentor, a psychological evaluation, and visitation. Soto provided Mother with extensive counseling to help her gain insight into the domestic violence and her own trauma she suffered as a child. Soto had multiple monthly compliance or other contacts with Mother where they discussed Mother's case plan requirements and progress, and Soto offered encouragement and help with difficulties. Indeed, in June 2022, Mother texted Soto, stating "I know you have always resolved my issues and I am thankful for that." Soto collaborated with Mother's therapists and repeatedly tried to identify programs or other therapists to help Mother address her issues. SSA provided Mother with reasonable visitation, even approving Mother's friends as a supervisor when

---

[4] We note Mother does not challenge the court's decision to not return L.R. to her care.

she complained about Olive Crest and Caregiver. The record establishes Mother's issue was not a lack of services but instead her commitment to the services SSA provided.

Mother asserts SSA failed to provide ongoing therapy, failed to refer her to additional PEP classes, failed to refer her to reality-oriented therapy within a reasonable time, and failed to facilitate a timely 730 evaluation. Although the therapy might not have been the best that would be provided in an ideal world, it was reasonable under the circumstances. (*Misako R., supra,* 2 Cal.App.4th at p. 547.) Her contention additional therapy would have helped her gain insight into her role in the domestic violence is pure speculation. Mother got plenty of services but failed to take advantage of them.

Mother complains there was a 16-month delay from when Carey first recommended a 730 evaluation, June 2021, to when the 730 evaluation was completed, October 2022. We note the delay cannot be attributed solely to SSA. Mother resisted the 730 evaluation, the paperwork was lost, and Apodaca got sick and requested an extension. Additionally, a 730 evaluation is not a service. Other than her claim concerning therapy, Mother does not explain how the delay in the 730 evaluation rendered her services unreasonable.

Mother contends Soto's recommendations concerning services were based on flawed reasoning concerning substance abuse, sexual abuse of L.R., and L.R.'s special needs. First, these were allegations the court sustained that resulted in L.R.'s dependency and Soto was justified in including them in therapy referrals. Second, even assuming Soto's reasoning was flawed regarding these allegations, it does not demonstrate her services as a whole were unreasonable. Mother criticizes Soto for not liberalizing her visitation. There was overwhelming evidence Mother's visitation deteriorated, she did not follow visitation guidelines, and she had unauthorized visitors.

Finally, Mother complains the juvenile court did not rule on the progress and reasonableness of services until nearly two years after disposition. It is true the court continued the matter numerous times for various reasons not attributable to one party or

24

the court. And it is true review hearings represent one of the significant safeguards built into the dependency system. (*David B. v. Superior Court* (2004) 140 Cal.App.4th 772, 778.) But Mother was represented by counsel during the pendency of these proceedings. She could have objected to the continuances. She did not.

Based on the record before us, there was sufficient evidence SSA provided Mother reasonable services. The juvenile court did not err by terminating reunification services and setting the .26 hearing for July 12, 2023.

## DISPOSITION

The petition for writ of mandate is denied.


O'LEARY, P. J.

WE CONCUR:


SANCHEZ, J.


DELANEY, J.

25